142 F.3d 90
 1998-1 Trade Cases P 72,111
 TOPS MARKETS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
QUALITY MARKETS, INC.; The Penn Traffic Company; Sunrise
Properties, Inc., Defendants-Appellees,
James V. Paige, Jr., Defendant-Appellee-Cross-Appellant.
 Docket Nos. 97-7392, 97-7448.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 27, 1997.
Decided April 9, 1998.
 
 Edward C. Cosgrove, Buffalo, NY, for Plaintiff-Appellant Tops Markets, Inc.
 Kenneth N. Hart, New York City (Vanessa E. Brosgol, Donovan Leisure Newton & Irvine, New York City; Charles C. Swanekamp, Saperston & Day, P.C., Buffalo, NY, of counsel), for Defendants-Appellees Quality Markets, Inc., The Penn Traffic Company and Sunrise Properties, Inc.
 David J. Seeger, Buffalo, NY, for Defendant-Appellee James V. Paige, Jr.
 Before: FEINBERG, CARDAMONE, and WALKER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 On this appeal from a dismissal of an antitrust complaint, we affirm all but one of the district court's rulings. We conclude that plaintiff's claim of attempted monopolization presents a genuine issue of material fact and should not have been dismissed. In ruling on this sort of cause of action it is important to distinguish aggressive competition from the kind of predatory conduct that tends to destroy competition. A wise insight suggests that a business that attains monopoly power is a business at the end of its journey. While defendants' pilgrimage was far from complete, a reasonable factfinder could believe that, by their words and actions, defendants here demonstrated a specific intent to create a monopoly with a dangerous probability of success. Were such to be found, it would demonstrate a failure of the market at the expense of the public, something the Sherman Act is designed to prevent.
 
 
 2
 Tops Markets, Inc. (Tops, plaintiff or appellant) appeals from an August 21, 1996 judgment of the United States District Court for the Western District of New York (Elfvin, J.) that: (1) granted summary judgment in favor of defendants Quality Markets, Inc., the Penn Traffic Company and Sunrise Properties, Inc., and defendant James V. Paige, Jr.; (2) dismissed plaintiff's federal antitrust claims; and, (3) declined to exercise pendent jurisdiction over remaining state law claims and counterclaims, dismissing them all without prejudice. Defendant Paige cross-appeals the dismissal without prejudice of plaintiff's state law claims against him, and the dismissal of his state law counterclaims against plaintiff.
 
 FACTS
 
 3
 The corporate parties to this action include: plaintiff Tops Markets, a New York corporation engaged in the retail supermarket business, operating 53 supermarkets and 87 convenience stores in western New York; defendant Penn Traffic Company (Penn), which owns and operates 267 supermarkets and 15 discount department stores throughout New York, Pennsylvania, Ohio and West Virginia; defendant Quality Markets (Quality), a New York corporation that is a division of Penn and competes with Tops by operating supermarkets in western New York and western Pennsylvania; and defendant Sunrise Properties (Sunrise), a Pennsylvania corporation and wholly-owned subsidiary of Penn that owns and develops commercial real estate for Penn and its divisions. Quality, Penn and Sunrise together comprise the "Quality defendants." The remaining party is defendant James V. Paige, Jr., a Jamestown, New York, real estate developer.
 
 A. The Relevant Market
 
 4
 For purposes of reviewing the grant of summary judgment in this antitrust appeal, the relevant geographical market is that to which the parties stipulated: an area in the southeastern portion of Chautauqua County, New York, extending approximately seven to ten miles in all directions from the city of Jamestown. The area includes 17 municipalities and is populated by approximately 75,000 people. The parties also stipulated that the relevant product market consists of the retail sale by "supermarkets" of predominantly food items, together with general household merchandise. A "supermarket" is defined as a retail store with at least 7,500 square feet of retail space that sells a full range of perishable and non-perishable food items and general household merchandise.
 
 
 5
 The Jamestown market recently has undergone dramatic changes. In 1992 Quality owned five of the nine supermarkets in the geographical market. Of the remaining four supermarkets, "Bells" and "Super Duper" each owned and operated two. In January 1993 Quality acquired and within one year closed both "Bells" stores. In April 1995 it purchased both "Super Duper" stores and immediately shut them both as well. In May 1995 Wegmans, a Quality competitor, successfully opened a large 100,000 square foot supermarket in the Jamestown market area.
 
 
 6
 B. The Disputed Act: The Washington Street Site
 
 
 7
 Tops owned a supermarket in the Jamestown market until 1984 when it voluntarily terminated operations there. Seven years later, in 1991, it resolved to re-enter the Jamestown market and commissioned studies to evaluate the feasibility and profitability of numerous potential sites for a new store location. These studies determined certain property located on Washington Street in Jamestown (the Washington Street site) was the most suitable spot for a supermarket. The Washington Street site consisted of several parcels of land, four of which were owned by defendant Paige.
 
 
 8
 Paige agreed to sell his four parcels to Tops. Under the terms of a March 13, 1992 contract, Paige undertook to transfer title to Tops for $475,000. The parties set December 15, 1992 as the date for closing, subject to change only by their mutual agreement. The contract also called for Paige to obtain options to purchase the remaining parcels he did not own at the Washington Street site, giving him until March 15, 1992 to comply with this requirement. The contract specified that if Paige failed to acquire these additional parcels, Tops could elect unilaterally to terminate the agreement.
 
 
 9
 When Quality discovered Tops' intention to re-enter the Jamestown market at the Washington Street site, it expressed an interest in acquiring two of Paige's Washington site parcels. Paige and Sunrise subsequently entered into a "Back-Up" agreement on June 30, 1992 under which Sunrise would acquire for $225,000 two non-contiguous parcels lacking any frontage on Washington Street. The contract of sale was made expressly contingent upon the termination of Paige's prior contract with Tops.
 
 
 10
 Sunrise and Paige restructured their contract on November 4, 1992 to grant Sunrise the option to purchase the same two parcels for a total purchase price (i.e., the sum of the option price and the "strike price") of $360,000. This arrangement again was amended on January 27, 1993 to increase the total purchase price to $765,000. Also included was a right of repurchase by Paige within one year after the deed to the property was conveyed to Sunrise. Any repurchase however, would be subject to a deed restriction limiting the property to uses other than a supermarket. On the same day that the second amendment was prepared, Paige notified Sunrise that his contract with Tops had terminated. Sunrise thereafter exercised its option and did acquire title to the two Washington Street parcels in April 1993. This lawsuit followed.
 
 
 11
 Plaintiff eventually acquired the entire Washington Street site when the Jamestown Urban Renewal Agency, exercising its power of eminent domain, condemned the property and later sold it to Tops. Tops opened a superstore at the site on April 19, 1997.
 
 C. Prior Proceedings
 
 12
 Plaintiff filed the present action in the Western District of New York in April 1993 to recover damages from the Quality defendants and Paige for their alleged violations of *95s § 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2. It also asserted state law claims against the Quality defendants for violations of New York state antitrust laws and tortious interference with a contractual relationship. As against Paige, it further alleged breach of contract, breach of fiduciary duty, and fraud. Maintaining no binding contract existed between him and Tops, Paige counterclaimed against Tops on several state law grounds including fraud, tortious interference with a contractual relationship, wrongfully clouding title, and defamation.
 
 
 13
 Defendants moved for summary judgment with respect to all of plaintiff's causes of action. In its August 21, 1996 judgment, the trial court ruled that Tops failed to establish facts from which a reasonable jury could find that defendants violated either § 1 or § 2 of the Sherman Act. It determined, with respect to plaintiff's § 1 cause of action, that Tops failed to show either an actual adverse effect on competition in the Jamestown market or Quality's possession of market power. With respect to the § 2 cause of action, it further ruled that Tops failed to demonstrate Quality had either the requisite market power or potential market power to sustain a monopolization or attempted monopolization claim respectively.
 
 
 14
 Plaintiff urges on appeal that dismissing its Sherman Act causes of action was error. Paige cross-appeals, arguing the district court should have entertained his state law counterclaims and dismissed Tops' state law claims against him with prejudice. We affirm, in part, reverse, in part, and remand this case to the district court for further proceedings.
 
 DISCUSSION
 Standard of Review
 
 15
 This appeal comes before us as a result of a grant of summary judgment. Courts use summary judgment "to isolate and dispose of factually unsupported claims," Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), particularly in the antitrust context. By avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 593-94, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986); Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 541 (2d Cir.1993).
 
 
 16
 We review a district court's grant of summary judgment de novo to ensure that the substantive antitrust law was correctly applied. See H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1011 (2d Cir.1989). The summary judgment remedy is appropriate only when there is no genuine issue of material fact. See Fed.R.Civ.P. 56(c). In making this determination, a court must consider the evidence in the light most favorable to the non-moving party. See Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). Although all reasonable inferences are drawn in the nonmovant's favor, in an antitrust case, those inferences must be reasonable in light of competing inferences of acceptable conduct. See Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356-57. Where the nonmoving party, in this instance Tops, carries the burden of proof at trial, it must go beyond the pleadings to demonstrate the existence of some specific facts that create a genuine issue as to those matters for which it has the burden of proof. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.
 
 Sherman Act Claims
 I The Sherman Act, § 1
 
 17
 With these standards in mind, we turn to the substance of the district court's rulings on the antitrust causes of action. Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1994). Tops alleges the defendants violated § 1 by conspiring to prevent it from opening a store at the Washington Street site and competing in the supermarket business in the Jamestown market. To establish a § 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason. See Capital Imaging, 996 F.2d at 542.
 
 A. Concerted Action
 
 18
 Tops avers it produced sufficient evidence to demonstrate that the contract between Paige and Sunrise constituted a concerted action resulting in an unreasonable restraint of trade. Even assuming Tops could establish that an antitrust conspiracy existed among the defendants, it fails to show how defendants' activities comprised an unreasonable restraint of trade. Tops does not contend that defendants' action was illegal per se, but instead advances an argument under the rule of reason.
 
 
 19
 B. Rule of Reason and the Adverse-Effect Requirement
 
 
 20
 Under this rule, before a factfinder may consider the harms and benefits of the challenged behavior, a plaintiff initially must show that "the challenged action had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." Capital Imaging, 996 F.2d at 543 (emphasis in original). This requirement ensures that otherwise routine disputes between business competitors do not escalate to the status of an antitrust action. See Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 708 (4th Cir.1991). The Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a "competition-reducing" effect. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342-44, 110 S.Ct. 1884, 1893-95, 109 L.Ed.2d 333 (1990) (emphasis in original).
 
 
 21
 The district court found that Tops failed to produce evidence to sustain this initial burden, despite having two independent means by which to satisfy the adverse-effect requirement. On the one hand, it could have shown an actual adverse effect on competition, such as reduced output. See F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2018-19, 90 L.Ed.2d 445 (1986); K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 128 (2d Cir.1995); Capital Imaging, 996 F.2d at 546. Alternatively, if it failed to make such a showing, it could have demonstrated "adverse effect" indirectly by establishing that Quality had sufficient market power to cause an adverse effect on competition. See K.M.B. Warehouse, 61 F.3d at 128-29; Capital Imaging, 996 F.2d at 546. Market power is but a "surrogate for detrimental effects." Indiana Fed'n of Dentists, 476 U.S. at 461, 106 S.Ct. at 2019 (quoting 7 Phillip E. Areeda, Antitrust Law p 1511, at 429 (1986)).
 
 1. Actual Adverse Effect
 
 22
 Plaintiff failed to demonstrate an actual detrimental effect on competition. It relied almost entirely on the affidavit of Robert F. Kennedy (the Kennedy Affidavit), which discussed Quality's high market share and the competitive advantages that could have resulted in potentially higher prices, but significantly did not allege that prices were actually higher in the Jamestown market. The Kennedy Affidavit further failed to provide sufficient proof that Tops' exclusion from the market had, in fact, resulted in any decrease in the quality of service to Jamestown area shoppers. See Capital Imaging, 996 F.2d at 546.
 
 
 23
 Nor did Tops allege that other supermarkets were excluded from the market. The only clear effect of defendants' alleged conspiracy was to bar plaintiff from opening a store at the Washington Street site. But, the fact that Tops may have been prevented from competing in the Jamestown market does not alone prove an adverse effect on competition as a whole. See K.M.B. Warehouse, 61 F.3d at 128. For even if plaintiff were hindered from competing, nothing changed in the relevant product market from the consumer's perspective. See Balaklaw v. Lovell, 14 F.3d 793, 798-99 (2d Cir.1994).
 
 2. Market Power
 
 24
 Tops' showing of Quality's market power was also insufficient to satisfy its burden of demonstrating an adverse effect on the market as a whole. The Kennedy Affidavit asserted that, at all relevant times, Quality's share of the total sales of food items and general household merchandise in the Jamestown area market exceeded 72 percent. Plaintiff asks us to infer that this high market share equates to market power.
 
 
 25
 Even assuming this market share data implies that Quality possessed market power, Tops still would fail to satisfy its burden under the adverse-effect requirement. Market power, while necessary to show adverse effect indirectly, alone is insufficient. See K.M.B. Warehouse, 61 F.3d at 129. A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market. See id.; see also Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560, 1573 (11th Cir.1983) (requiring plaintiff to show high market share and that intrabrand competition was impeded, and that "the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence, of consumer welfare").
 
 
 26
 Yet, plaintiff provided no evidence other than market share to prove that defendants' action had an adverse effect on competition. The Kennedy Affidavit does not cure this deficiency. It declares that the nature of the interbrand market is such that supermarkets compete for geographic location, seeking a site with close proximity to high concentrations of people, convenience, accessibility, visibility and space. But Quality's purchase of the Washington Street site was not shown either directly or indirectly to have any adverse effect on competition. While Tops may not have readily acquired the location it preferred, Quality's one-time purchase of the site did not foreclose other prospective supermarket competitors from entering the market in desirable locations. We find particularly significant Wegmans' subsequent acquisition of land and construction of a 100,000 square foot store on a different site, which demonstrates the absence of geographic barriers preventing competitors from entering the Jamestown area. Within one year after opening, Wegmans captured approximately 26 percent of the Jamestown market.
 
 
 27
 Hence, despite Quality's presumed market power, Tops still failed to show any adverse effect on competition as a whole. As such, Judge Elfvin properly dismissed its § 1 Sherman Act claim.
 
 II The Sherman Act, § 2
 
 28
 Section 2 of the Sherman Act makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2 (1994). Thus, § 2 forbids both monopolization and attempted monopolization. We address each offense in turn.
 
 A. Completed Monopolization
 
 29
 To establish a § 2 violation for completed monopolization, a plaintiff must produce evidence sufficient to prove the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power. See United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990). The second element is distinct from business growth or development as a consequence of superior product, business acumen or historic accident. See Grinnell Corp., 384 U.S. at 571, 86 S.Ct. at 1704.
 
 
 30
 The district court granted summary judgment in favor of defendants regarding Tops' claim for completed monopolization. It held, as a matter of law, without even addressing the issue of defendants' conduct, that Quality lacked the requisite monopoly power. We must therefore carefully consider whether the relevant evidence created an issue of fact for the jury regarding monopoly power.
 
 
 31
 Monopoly power, also referred to as market power, see International Distrib. Ctrs., Inc. v. Walsh Trucking, 812 F.2d 786, 791 (2d Cir.1987), is "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). It may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market. See K.M.B. Warehouse, 61 F.3d at 129. Tops sought to prove Quality's monopoly power by proffering evidence on both points.
 
 
 32
 With respect to direct evidence, plaintiff produced the Kennedy Affidavit, which explained Quality's potential ability to control prices in the following terms:
 
 
 33
 Currently, consumers in general must choose between Wegmans and a Quality store which will almost always be closer to their homes than Wegmans' Ellicott facility. Those Jamestown area residents living in outlying areas will most likely find it less convenient and impracticable (especially for purchases of perishable goods) to shop at Wegmans. This scenario would certainly endow Quality with the power to raise prices and limit both selections of grocery items and services unless the competitive structure of the industry were to change, i.e., unless another competitor were to open a centrally located store which would give the majority of consumers a meaningful choice as to where to fill their weekly grocery list.
 
 
 34
 Kennedy Aff. p 19 (emphasis added). Kennedy's conclusion expressly assumes, without offering any support, that no other competitors would enter the market were Quality to raise its prices. This proposition suggesting Quality's purported monopoly power is too speculative to create an issue of fact for the jury. It neither demonstrates Quality's present ability to raise prices, nor evidences the exclusion of competition from the Jamestown market area.
 
 
 35
 Tops next presented evidence of Quality's high market share in the Jamestown market to establish indirectly Quality's monopoly power. While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power. See Consolidated Rail, 902 F.2d at 179. A court may infer monopoly power from a high market share. See Grinnell, 384 U.S. at 571, 86 S.Ct. at 1704 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."); Broadway Delivery Corp. v. United Parcel Serv. of America, Inc., 651 F.2d 122, 129 (2d Cir.1981) ("[T]he higher a market share, the stronger is the inference of monopoly power."); cf. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741-42, 10 L.Ed.2d 915 (1963) (explaining that where a merger results in one firm controlling a high percentage of the relevant market, it is inherently likely to lessen competition substantially).
 
 
 36
 A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics. See, e.g., Walsh Trucking, 812 F.2d at 792 ("Other market characteristics must also be considered in determining whether a given firm has monopoly power...."); Hayden Publ'g Co. v. Cox Broad. Corp., 730 F.2d 64, 68 (2d Cir.1984) ("[A] number of factors must be considered in determining whether monopoly power exists."); Broadway Delivery, 651 F.2d at 128 ("[T]he true significance of market share data can be determined only after careful analysis of the particular market."). These characteristics include the "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." Walsh Trucking, 812 F.2d at 792; see also Hayden Publ'g Co., 730 F.2d at 68-69 (discussing some of these factors); Broadway Delivery, 651 F.2d at 128 (same).
 
 
 37
 In the case at hand, Tops presented evidence that Quality's share of the total sales of food items and general household merchandise by Jamestown area supermarkets always exceeded 72 percent. At the time Quality contracted with Paige in 1992 to purchase the Washington Street property, Quality's market share stood at roughly 73 percent. After its acquisition and closing of the "Bells" and "Super Duper" stores and the opening of the Wegmans store, Quality's share steadied at 74 percent in 1995.
 
 
 38
 Tops asks us to infer Quality's monopoly power from these statistics. We have held that a market share of over 70 percent is usually "strong evidence" of monopoly power. See Broadway Delivery, 651 F.2d at 129 ("Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."). Nonetheless, such evidence does not conclusively establish Quality's monopoly power. See id. at 128 ("The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence.").
 
 
 39
 At this juncture, either plaintiff or defendants may introduce evidence regarding these other market factors to determine whether Quality possessed monopoly power. See 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, p 532a, at 161 (1995) ("[T]he courts generally allow the defendant to rebut inferences of market power by showing easy entry conditions."). The Quality defendants point to several facts in the record suggesting there are no barriers to entry, and Tops failed to produce any further evidence to rebut this assertion. Tops alleges that site availability in the Jamestown market was extremely limited, but offers no proof demonstrating what geographic barriers inhibit a competitor's ability to enter that market. Instead, the record suggests that undeveloped land on which to locate a supermarket has been available at all relevant times throughout the market area. As already noted, Wegmans, a major competitor of Quality, opened a 100,000 square foot store at a different site in 1995 and quickly gained a respectable share of the market. Even Tops' own contemporaneous market studies indicate that Quality did not have such a strong market position as to enable it to exclude competitors. According to these studies, competitors, like Tops and Wegmans, could readily enter the Jamestown market at any number of available sites and successfully compete for supermarket sales.
 
 
 40
 We agree with Judge Elfvin's conclusion that as a matter of law, despite evidence of Quality's high market share, consideration of other relevant factors does not support a conclusion that Quality did, in fact, possess monopoly power. We cannot be blinded by market share figures and ignore marketplace realities, such as the relative ease of competitive entry. Had Wegmans not gained such a high market share within such a short period, we might recognize at least a genuine issue of material fact as to monopoly power, in light of Quality's over-70 percent market share. Wegmans' successful entry, however, itself refutes any inference of the existence of monopoly power that might be drawn from Quality's market share. If Quality were to raise its prices above their competitive level, new competitors could and would enter the market and, by undercutting those prices, quickly erode Quality's market share. See, e.g., Oahu Gas Serv., Inc. v. Pacific Resources Inc., 838 F.2d 360, 366 (9th Cir.1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.") (citations omitted); Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1335 (7th Cir.1986) ("[T]he lower the barriers to entry ... the less power existing firms have.").
 
 
 41
 On this record we can draw no reasonable inference other than that Quality lacks monopoly power. Despite its high market share, no other evidence--such as barriers to entry, the elasticity of demand, or the nature of defendant's conduct--supports the conclusion that Quality can control prices or exclude competition and in fact, Wegmans' quick garnishment of such high market share dispositively refutes such a conclusion. Thus, absent a showing of Quality's monopoly power, Tops' claim for completed monopolization was properly dismissed.
 
 B. Attempted Monopolization
 
 42
 To establish a claim for attempted monopolization, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 890-91, 122 L.Ed.2d 247 (1993); see also Walsh Trucking, 812 F.2d at 790. In the discussion that follows we deal first with anticompetitive conduct, second with a dangerous probability of achieving monopoly power and, third, with defendants' intent.
 
 1. Anticompetitive Conduct
 
 43
 A factfinder could reasonably find that the Quality defendants' and Paige's conduct was anticompetitive. For purposes of this summary judgment motion, we assume that a valid contract existed between Paige and Tops for the sale of the Washington Street site; the Quality defendants interfered with that contract and induced Paige to breach it; and Paige then sold to Sunrise the land targeted by Tops for its store site. The plain effect of this conduct was to prevent Tops, a Quality competitor, from entering the Jamestown market at the Washington site.
 
 2. Dangerous Probability of Success
 
 44
 The district court determined, again as a matter of law, that there was no proof of a dangerous probability that Quality would achieve monopoly power and therefore dismissed the attempted monopolization claim. We think, to the contrary, that a factfinder could reasonably find that Quality was close to achieving monopoly power. Critical to deciding the dangerous probability prong of plaintiff's attempted monopolization claim is defendant's economic power in the relevant market. See Spectrum Sports, 506 U.S. at 458-59, 113 S.Ct. at 891-92. Attempted monopolization requires some degree of market power. See Walsh Trucking, 812 F.2d at 791. In considering the likelihood of achieving monopoly power, we employ the same concept of market power as that used in a completed monopolization claim, i.e., one which considers the defendant's relevant market share in light of other market characteristics, including barriers to entry. See H.L. Hayden Co., 879 F.2d at 1017; Walsh Trucking, 812 F.2d at 791.
 
 
 45
 Despite the similar approaches, a lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim. See id. (noting that the offense of attempted monopolization reaches further than the offense of completed monopolization); Northeastern Tel., 651 F.2d at 85 (explaining that the offense of attempted monopolization encompasses conduct by firms lacking monopoly power). That Tops failed to demonstrate the monopoly power required to prove the offense of completed monopolization therefore does not, a fortiori, lead to the conclusion that it failed to make a sufficient showing with respect to its attempted monopolization cause of action.
 
 
 46
 In view of the lowered quantum of proof requirement, the minimum threshold of evidence Tops must adduce to survive summary judgment on its attempted monopolization claim is reduced. While concededly, Tops proffered only Quality's market share figures as evidence of a dangerous probability of success, those figures demonstrate that Quality possessed a market share exceeding 72 percent when it purchased the Washington Street parcels. Holding such a large market share percentage at the time when defendants took other anticompetitive actions is sufficient, in our mind, to create a genuine factual issue as to whether there was a dangerous probability that Quality would achieve monopoly power. See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 999 (11th Cir.1993); McGahee v. Northern Propane Gas Co., 858 F.2d 1487, 1506 (11th Cir.1988) (finding that a 60 or 65 percent market share is sufficiently large to create a genuine issue of material fact as to whether there was a dangerous probability of success); see also H.L. Hayden Co., 879 F.2d at 1017 (holding a dangerous probability of monopoly may exist where a party possesses a significant market share at the time it undertakes the challenged anticompetitive conduct); Walsh Trucking, 812 F.2d at 791 (same); 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, p 801a, at 301 (1996) (suggesting it is reasonable to presume substantial market power when defendant's share of relevant market exceeds 70-75 percent for the five years preceding the complaint).
 
 
 47
 We recognize that the Quality defendants point to the lack of barriers to entry, and that we found such evidence dispositive in our previous discussion of market power regarding a completed monopolization claim. Yet, with respect to an attempted monopolization claim, such evidence is insufficient to support summary judgment in defendants' favor. Because plaintiff's quantum of proof is lower in this context, defendants' evidence serves only to raise questions of fact for trial. Whereas Tops' proof of market share alone--even when countered with evidence of easy market access--failed to show as a matter of law that Quality actually possessed market power, it could nevertheless support a finding that Quality had a dangerous probability of achieving market power. See 4 Phillip Areeda & Donald F. Turner, Antitrust Law, p 917a, at 86 (1980) ("Particularly disturbing is a study showing that concentration in food retailing markets, where entry barriers seem to be very low, had large adverse [anticompetitive] price effects."). Plaintiff's attempted monopolization claim therefore survives summary judgment on this point.
 
 
 48
 Consequently, on remand, the jury should be instructed to consider the impact of other market characteristics, particularly the barriers to entry, on this high market share to determine whether a dangerous probability, in fact, existed. A jury may also properly consider Quality's subsequent decline in market share attributable to the entry and growth of a competitor. See 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, p 807el, at 358 (1996).
 
 3. Specific Intent
 
 49
 a. Quality's Intent. Although the completed offense of monopolization requires only a general intent, "a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt." Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). An examination of the record would permit a reasonable factfinder to find that the Quality defendants intended to acquire monopoly power.
 
 
 50
 To begin with, defendants' intent can be derived from their words. Defendants' officials frequently affirmed their stated goal of preventing Tops from entering the Jamestown market. See Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc., 845 F.2d 404, 408 (2d Cir.1988), aff'd on other grounds, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (finding sufficient evidence of intent where defendants' officials frequently reaffirmed their goal to drive plaintiffs from the Burlington market and engaged in predatory pricing). For example, John Dixon, then-president of Quality and current President and C.E.O. of Penn, stated that one reason why the Quality defendants purchased the Washington Street parcels was to prevent Tops from competing at that site. Gary Hirsh, Chairman of the Board at Penn, echoed this sentiment. After purchasing the disputed parcels, the Quality defendants announced at a press conference they would not allow the property to be used by a competing supermarket company. In fact, the "Second Amendment Agreement" between the Quality defendants and Paige is strong evidence of the Quality defendants' aim of preventing a supermarket from opening at the Washington Street site by requiring, if Paige repurchases the property, that he would preclude the development of a supermarket on the transferred parcels.
 
 
 51
 Second, a factfinder could also reasonably infer a specific intent to destroy competition from the Quality defendants' conduct. See Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76, 85 (2d Cir.1981) (explaining that proof of unlawful conduct may imply specific intent). The Quality defendants purchased for above-market value two non-contiguous land parcels with no street frontage, which are, by themselves, essentially undevelopable.[1] A jury could find this conduct was not motivated by a valid business justification. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605, 105 S.Ct. 2847, 2858-59, 86 L.Ed.2d 467 (1985). The Quality defendants obviously could have chosen a more profitable location for a possible convenience store, but were willing to pay a very substantial premium for land on Washington Street in an attempt to exclude Tops from entering the Jamestown market. Cf. Consolidated Rail, 902 F.2d at 178-79 (finding that defendant monopolist's pursuit of non-profit-maximizing market behavior supports a showing of willful acquisition of monopoly power for a completed monopolization claim); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 291 (2d Cir.1979) (finding that a monopolist's use of monopoly power to act in a manner "that a firm would have found substantially less effective, or even counterproductive, if it lacked market control" demonstrates a willful acquisition of monopoly power for a completed monopolization claim).
 
 
 52
 b. Paige's Intent. Paige also asserts he lacked the requisite intent to attempt to monopolize in violation of § 2 of the Act. He now urges that because he was never personally engaged in the supermarket retail business, he had no motive for influencing that industry within the relevant market. According to Paige, he was simply a local real estate developer innocently seeking the best available deal for property he held for sale.
 
 
 53
 While this argument may or may not ultimately be persuasive, we are unable to consider it now on appeal because it was not raised below. In seeking summary judgment, Paige bore the initial burden of "informing the district court of the basis for [his] motion." Celotex, 477 U.S. at 323, 106 S.Ct. at 2553; see also Capital Imaging, 996 F.2d at 542 ("The litigant seeking summary disposition of a case bears the initial burden of demonstrating, through affidavits or otherwise, the absence of genuine factual issues."). Although the movant need not support its motion with "affidavits or other similar materials negating the opponent's claim," Celotex, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original), his or her reasons for the motion somehow must be before the district court. Thus, Paige had the burden of demonstrating there was no factual support for the allegation that he possessed the requisite specific intent.
 
 
 54
 We find neither evidence of nor even any argument pertaining to Paige's allegedly "innocent" intentions in the record. Apart from his answer to Tops' complaint, in which he asserts a general denial of the Sherman Act antitrust allegations, Paige does not address the issue of his intent. To the contrary, his attorney's affidavit, which was attached to Paige's notice of motion for summary judgment, asserted three grounds for his motion:
 
 
 55
 3. The Defendant's motion is made on the following grounds:
 
 
 56
 a. The Plaintiff never had a valid or enforceable contract with the Defendant;
 
 
 57
 b. If the Plaintiff had a "Contract" with the Defendant, the Defendant notified the Plaintiff of the approaching closing date and the Plaintiff determined that it did not wish to close, justifying the Defendant in not closing the "Contract";
 
 
 58
 c. If the Plaintiff had a "Contract" with the Defendant, the Plaintiff committed an anticipatory breach of that "[C]ontract", justifying the Defendant in not closing the "Contract".
 
 
 59
 Paige expressly limited the basis for his motion to state contract law grounds. Moreover, neither Paige nor his attorney appeared at oral argument to advance any different grounds for urging summary judgment in Paige's favor. Because the district court was not given the opportunity to consider the issue of Paige's intent, summary judgment in his favor may not now be affirmed on this ground.
 
 State Law Claims and Counterclaims
 
 60
 Paige also cross-appeals on the ground that the district court erroneously dismissed without prejudice Tops' state law claims against him and his state law counterclaims against Tops. When Judge Elfvin granted summary judgment dismissing Tops' Sherman Act claims, the only federal claims, he properly declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed them without prejudice. The governing statute, 28 U.S.C. § 1367(c)(3) (1994), permits a district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims. Further, the Supreme Court, in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988), announced that when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice. See also Morse v. University of Vt., 973 F.2d 122, 127-28 (2d Cir.1992) (same). Hence, contrary to Paige's assertions, the district court was correct not only in dismissing the state law causes of action, but also in dismissing them without prejudice.
 
 
 61
 Thereafter, pursuant to a stipulation, the district court ordered, on March 4, 1997, that the parties would be granted leave to re-file their state law claims and counterclaims, if we remanded the federal antitrust claims. Since we are remanding this case on the attempted monopolization cause of action, Tops is free to refile its state law claims and Paige may also reassert his state law counterclaims in federal court. Because the district court did not make a final decision on the merits of these causes, we cannot now review their merits. See 28 U.S.C. § 1291 (1994).
 
 CONCLUSION
 
 62
 Accordingly, for the foregoing reasons, we affirm the district court's dismissal of the Sherman Act § 1 claim and the § 2 claim for completed monopolization. We vacate the dismissal of the § 2 claim for attempted monopolization, and remand that cause of action to the district court for further proceedings consistent with this opinion.
 
 
 63
 Affirmed, in part, vacated, in part, and remanded.
 
 
 
 [1]
 Quality originally agreed to pay $225,000 and then later bought the two parcels for a total price of $765,000. Tops had been willing to pay $475,000 for all four of Paige's Washington site parcels