**PLANETARIUM TRAVEL,
INC., Plaintiffs,**

v.

**ALTOUR INTERNATIONAL,
INC., Defendant.**

**No. 13 Civ. 8538(AT).**

United States District Court,
S.D. New York.

Signed March 16, 2015.

David Joseph DeToffol, David J. DeToffol, Esq., P.C., New York, NY, for Plaintiffs.

Evan Shapiro, Skarzynski Black LLC, New York, NY, for Defendant.

## *ORDER*

ANALISA TORRES, District Judge:

Plaintiff, Planetarium Travel, Inc. ("Planetarium"), brings this action alleging violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Defendant, Altour International, Inc. ("Altour") moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Altour's motion is GRANTED.

## BACKGROUND

Planetarium is a travel agency that specializes in selling discounted first and business-class airline tickets.[1] Planetarium operates as a ticket consolidator by pur-

---

1. The following facts are taken from the amended complaint unless indicated otherwise and accepted as true for the purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

chasing from the airlines a high volume of "deeply discounted first and business class tickets for resale" to a variety of customers such as large corporations and other travel agencies. Am. Compl. ¶¶ 16, 43.

In 1995, Planetarium signed a non-exclusive franchise agreement with non-party American Express Travel Related Services Company, Inc. ("Amex"), a travel-focused subsidiary of the American Express credit card company. Id. ¶¶ 10–11.[2] Under the terms of the agreement, Planetarium became an "Amex travel representative office" and was given access to Amex's travel representative network (the "Amex Network"). Id. ¶¶ 11, 13. With this access, Planetarium was permitted to utilize Amex's marketing, branding, and promotions to sell discounted airline tickets and other travel products to members of the Amex Network, such as Amex's wholly-owned travel offices, other representative franchisees, and preferred suppliers. Id. ¶¶ 13, 38. Planetarium was also authorized to sell tickets directly to American Express cardholders ("Amex Cardholders") and to redeem cardholders' reward points. Id. ¶¶ 18. Planetarium's business depended heavily on its access to the Amex Network, as Planetarium derived over 85% of its $30 million dollars in annual sales to the Amex Network, while the remaining 15% constituted sales of discounted tickets to the general public. Id. ¶¶ 17, 19. Planetarium's agreement was regularly renewed annually. Id. ¶¶ 20.

In March and April 2009, Altour, a competing discounted ticket consolidator with $850 million in annual sales, met with Amex regarding a possible business arrangement. Id. ¶¶ 25, 46. Altour represented itself as a "key strategic participant" in the market for discounted first and business class airline tickets, and Alt-our and Amex entered into an agreement whereby Altour would become a supplier of discounted airline tickets to the Amex Network. Id. ¶¶ 24, 26. As part of their agreement, Altour negotiated "a number of so-called 'host agreements'" with members of the Amex Network in which these members agreed to exclusively purchase discounted airline tickets from Altour. Id. ¶¶ 49.

Planetarium refused to sign a "host agreement" with Altour and "protested their proliferation" within the Amex Network. Id. ¶¶ 52. As a result, Amex, induced by Altour, notified Planetarium in December 2009 that its franchise agreement with Amex would not be renewed and that Planetarium's status as a travel representative office would be terminated on March 31, 2010. Id. ¶¶ 20, 53. Planetarium was the only travel representative office that was not renewed. Id. ¶¶ 22. Planetarium contends that Altour persuaded Amex to terminate Planetarium's status as a travel representative office in order to engage a "long term *de facto* exclusive dealing arrangement" and that Altour and Amex engaged in a group boycott of Planetarium. Id. ¶¶ 26, 30.

## DISCUSSION

### I. *Standard of Review*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A plaintiff is not required to provide "de-

---

**2.** Amex captures approximately 9% of its cardholders' travel spending. Am. Compl. ¶ 15.

tailed factual allegations" in the complaint, but must assert "more than labels and conclusions[ ] and a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* On such a motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). A district court considering a Rule 12(b)(6) motion must accept all factual allegations in the complaint as true, while also drawing all reasonable inferences in favor of the non-moving party. *ATSI Commc'ns, Inc.,* 493 F.3d at 98.

## II. *The Relevant Market*

To state a claim under Section 1, a plaintiff must first allege a relevant, plausible product market that bears a "rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand." *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001) (Sotomayor, J.) (internal quotation marks omitted); *see also Re–Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 392 (S.D.N.Y.1993) ("Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices."). The relevant market must include all products that are " 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp. Health Inc.,* 649 F.3d 151, 155 (2d Cir.2011) (citation omitted). Different products may be considered reasonably in-

terchangeable if there is cross-elasticity of demand, which exists when "consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999). A failure to include reasonably interchangeable products or to assess the cross-elasticity of demand renders the market definition legally insufficient and is grounds for granting a motion to dismiss. *Chapman v. New York State Div. for Youth,* 546 F.3d 230, 238 (2d Cir.2008).

Planetarium alleges that Altour conspired with Amex to restrain trade in the sale of discounted first and business class airline tickets in three markets: the Amex Network market, the Amex Cardholders market, and the general public market. Am. Compl. ¶¶ 34, 38–40. The Second Circuit has stated that "[c]ases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Todd,* 275 F.3d at 200. Planetarium's market definitions fail for both of those reasons.

### A. Markets Defined By Consumers

First, Planetarium's division of the market by customer is too narrow and is unsupported. Although a market may be limited to a particular group of consumers, *PepsiCo, Inc. v. Coca–Cola Co.,* 114 F.Supp.2d 243, 248 (S.D.N.Y.2000), *aff'd,* 315 F.3d 101 (2d Cir.2002), such limits must be justified, *see City of New York,* 649 F.3d at 156 (rejecting a market defined by the City of New York's preferences for health insurance providers that ignored the larger competition among in-

surance providers for the City's business); *Chapman,* 546 F.3d at 238 (rejecting a market definition of "restraint training services [sold] to private child care providers" as too narrow because the plaintiff failed to demonstrate how the sale of these services to private child care providers was different from the sale of restraint services to other businesses or organizations).

■ Here, Planetarium provides no basis for narrowing the market for discounted airline tickets to members of the Amex Network and to Amex Cardholders. With respect to the Amex Network, Planetarium defines this market as "a conglomerate of several hundred independent U.S. entities holding franchise agreements with Amex" that purchase network services such as Amex marketing, branding, customer information, and invitations to franchisee conferences. Am. Compl. ¶ 38. However, as is the case with Planetarium, these entities are independent, and there is no allegation that all Amex Network members are required to operate exclusively within the Amex Network. *See, e.g., id.* ¶ 43 (examples of Planetarium's business indicating non-exclusivity of franchise agreement). In addition, although Planetarium states, in a conclusory manner, that Amex and Altour conspired to make Altour the exclusive supplier of discounted first and business class airline tickets, a cursory inspection of the amended complaint and attached documents reveals that any exclusivity agreement was voluntary, not mandatory, for members of the Amex Network. *See id.* ¶ 49 ("Altour *negotiated a number* of so-called 'host agreements' to provide Altour dominant trade status in the Amex Network Market.") (emphasis added); *id.* Ex. 4 (e-mail from Amex representative to Altour representative: "Technically, we cannot stop our Reps from soliciting members in the Rep Network. They network and exchange emails on their own. However, we (Amex) only promote and provide member lists of

email[s] to our preferred suppliers.... In the case with Altour partnership, *we would endorse your program and market accordingly* through various communications channels.") (emphasis added).

With respect to the Amex Cardholder market, there are similarly no allegations that Amex Cardholders are required to purchase discounted first and business class tickets through the Amex Network or from Altour. In the case of both the Amex Network market and the Amex Cardholder market, there is no basis to conclude that, in the event of a price increase in discounted airfare by Altour, these consumers would be constrained from purchasing airline tickets from non-Amex or non-Altour entities. Moreover, courts routinely reject markets defined by a single product or brand. *Mooney v. AXA Advisors, L.L.C.,* 19 F.Supp.3d 486, 500–01 (S.D.N.Y.2014) ("The widespread rejection of single-brand markets is not some creature of brittle formalism. Rather, courts rebuff these market definitions because single-brand markets—whatever their theoretical possibility—are consistently pled in a manner that lacks plausibility or is otherwise untethered to economic reality."); *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.,* 713 F.Supp.2d 286, 298 (S.D.N.Y.2010) (collecting cases). Planetarium's attempt to limit the product market to specific Amex-based customer groups is unsupported by the allegations in its own complaint and by the realities of the market for airline tickets. *See Skyline Travel, Inc. (NJ) v. Emirates,* 09 Civ. 8007, 2011 WL 1239783, at *3 (S.D.N.Y. Mar. 28, 2011) ("Plaintiffs' papers are also devoid of any explanation as to why the consumer side of the relevant market could properly be defined for antitrust purposes to exclude all but Indian and Pakistani passengers from New Jersey."), *aff'd,* 476 Fed.Appx. 480 (2d Cir. 2012).

■ Although Planetarium also alleges a broad market of discounted first and business class tickets sold to the general public, Planetarium has offered no facts regarding the size of this proposed market, market participants, market shares, or any information to guide the Court in assessing its validity. Therefore, the general public market is also legally insufficient. *See Bayer Schering Pharma AG v. Sandoz, Inc.,* 813 F.Supp.2d 569, 578 (S.D.N.Y. 2011) (dismissing Section 1 claims for failure to allege plausible market); *Gianna Enterprises v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982) ("The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [potential substitutes].").

### B. Markets Defined By Price

■ Second, Planetarium's narrowing of the product market by price to discounted first and business class tickets is implausible and unsupported. Planetarium does not provide details regarding the degree of discounts offered or any allegations to support a division of the market for first and business class airline tickets by price.[3] Although price disparities may be considered in evaluating a product market, a litigant must supply some factual support, such as a large price difference that alters consumer behavior, to justify separate markets. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (declining to hold that medium-priced shoes did not compete with low-priced shoes because the boundaries of that proposed market definition were "unrealistic"). *But see Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 497

(2d Cir.2004) (stating that *Brown Shoe* did not preclude a finding of separate markets based on significant differences in price if those price differentials were substantial enough to indicate a divergence in market participant behavior). Planetarium has not done so. There is no support for the contention that regular-priced first and business class airline tickets belong to a different market than discounted tickets, and there is no rational basis to believe that consumers of first and business class tickets would prefer a higher or regular-priced ticket over a discounted equivalent. *Cf. Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 705 (S.D.N.Y.1997) (rejecting market consisting of only TWA tickets because certain "package factors" unique to TWA such as "flight time and date, mileage, first class confirmed seat at full fare price" merely represented customer preference, but all tickets, regardless of the package factors, permitted customers to travel between destinations).

### III. *Failure to Allege an Unreasonable Restraint of Trade*

■ Section 1 prohibits "concerted action between two legally distinct entities resulting in an unreasonable restraint on trade." *E & L Consulting, Ltd. v. Doman Indus. Ltd.,* 472 F.3d 23, 29 (2d Cir.2006). Although rare, some agreements are considered so manifestly detrimental to competition that they are presumed *per se* unreasonable and illegal without an extensive inquiry. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 315 (2d Cir.2008). In most cases, however, conduct is evaluated under the rule of

---

**3.** *In conjunction with its opposition papers,* Planetarium submitted an affidavit from its president Blake Fleetwood that describes the competing discounts and commissions offered by Planetarium and Altour. However, the Court cannot consider this document at the motion to dismiss phase, a point that Planetarium concedes. *See* Pl. Mem. 22–23; *Wachtel v. Nat'l R.R. Passenger Corp.,* 11 Civ. 613, 2012 WL 292352, at *2 (S.D.N.Y. Jan. 30, 2012).

reason, in which the plaintiff must demonstrate that the defendants' conduct unreasonably restrained trade under a burden-shifting framework. *Geneva Pharm. Tech. Corp.*, 386 F.3d at 506–07.

## A. *Per Se* Violation

 Planetarium alleges violations of Section 1 under both the *per se* and rule of reason analyses. Planetarium's claims fails under either theory. First, Planetarium cannot make out a *per se* claim because the arrangements at issue are vertical, and the *per se* rule does not apply. Planetarium has a franchise agreement with Amex and is permitted to supply discounted airline tickets to the Amex Network and to Amex Cardholders. Am. Compl. ¶¶ 16–18. Planetarium does not compete with Amex to sell discounted airline tickets. Any restraints placed on Planetarium by Amex are vertical. *See Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 13 Civ. 7307, 56 F.Supp.3d 436, 447, 2014 WL 4804465, at *7 (S.D.N.Y. Sept. 26, 2014) ("[A]greements between persons at different levels of a market structure, for example between manufacturer and distributor or between franchisor and franchisee—referred to as vertical restraints—are analyzed under the rule of reason.") (citation and quotation marks omitted). Altour is a direct competitor to Planetarium and is similarly situated with respect to Amex. Am. Compl. ¶¶ 25, 44, 53. Thus, any restraint between Altour and Amex is also vertical. Given the vertical nature of the agreements at issue, the *per se* rule is inappropriate, and the rule of reason applies. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 899, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007); *see also Flash Electronics, Inc. v. Universal Music & Video Distribution Corp.*, 312 F.Supp.2d 379, 386 (E.D.N.Y.2004) ("Courts have refused to place exclusive distributorship agreements within the category of *per se* restraints not simply because they are vertical in nature, but because vertical restrictions on intra-brand competition often have the procompetitive effect of increasing interbrand competition in the relevant market.").

## B. Rule of Reason Violation

 Under a rule of reason analysis, Planetarium still fails to state a claim. Planetarium must show either: (1) that the defendant has sufficient market power to reduce competition market-wide and there is reason to believe that the defendant will, in fact, harm competition, or (2) an adverse effect on competition. *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F.Supp.2d 612, 619–20 (S.D.N.Y.2013) (citing *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995)); *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir.1998). Importantly, "[b]ecause the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice." *Geneva Pharm. Tech. Corp.*, 386 F.3d at 507.

### 1. Market Power and Market Shares

 Planetarium alleges that Amex "controls a major market share of the supply, distribution and sale of discounted first and business class airline tickets ... to U.S. based end-using individuals and travel agencies," Am. Compl. ¶ 7, but Planetarium's amended complaint reveals that this purported market share is conclusory and implausible. Planetarium states that Amex controlled only 9% of its cardholders' travel spending at some point prior to this litigation. *Id.* ¶¶ 15. This market share is insufficient to provide Amex, and in turn, Altour, with the market power to affect competition in any market. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26–27, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (holding that a market

share of 30% was insufficient to permit exercise of market power); *Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F.Supp.2d 50, 74–75 (S.D.N.Y. 2003) (collecting cases). Similarly, Planetarium alleges that Altour "retains a major market share among other markets in the U.S. based travel industry as a discount consolidator for discounted first and business class airline tickets," Am. Compl. ¶ 25, but it provides no allegations regarding the size and scope of the proposed market that Altour inhabits or Altour's position within that market. Planetarium also states that it was "the only of several hundred Amex travel representative offices to not be renewed," *Id.* ¶¶ 22, but it fails to supply information regarding other ticket consolidators within Amex Network. Planetarium provides no context for the alleged harmful effects of its termination within any of the markets described in the amended complaint. Given these serious deficiencies, Planetarium cannot plausibly allege that Amex or Altour possesses sufficient market power or that there is reason to believe that they will cause anticompetitive harm. *See Moccio v. Cablevision Sys. Corp.*, 208 F.Supp.2d 361, 379–80 (E.D.N.Y.2002) (dismissing Section 1 claim when the plaintiff failed to plead the scope or boundaries of the relevant market that it was allegedly excluded from).

### 2. Adverse Effect

■ Planetarium states that its termination has resulted in higher prices for first and business class airline tickets, but it fails to offer a plausible theory of anticompetitive harm. Stripped of its labels and conclusions, all that Planetarium alleges is that Amex terminated its franchise agreement after prodding from Altour. Without more, this is insufficient to state a violation of the antitrust laws. An exclusive dealing arrangement between a distributor and a supplier is presumptively lawful, *E & L Consulting, Ltd.*, 472 F.3d at 30, and Planetarium has not explained how an arrangement between Altour and Amex, exclusive or not, would affect the market for first and business class airline tickets. *See Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir.1997) ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor ... and to appoint an exclusive distributor."); *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 11 Civ. 6353, 2012 WL 2376466, at *5, *12–13 (S.D.N.Y. June 20, 2012) (holding that a manufacturer's decision to terminate a price-cutting dealer was not concerted action and that such actions were not unreasonable); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage.").

As noted above, Amex Network members, Amex Cardholders and the general public are not required to purchase discounted first and business class tickets through Amex or from Altour. If Altour were to raise its prices on discounted airline tickets, all customer groups would have less incentive to purchase tickets through Amex—undermining, if not killing, Amex's and Altour's business—and customers would still be able to purchase airline tickets from the myriad other travel agencies and websites available. Neither Amex nor Altour has the ability to foreclose competition or raise prices in the market for discounted first and business class airline tickets. Because an arrangement between Amex and Altour that excludes Planetarium will not inhibit the

ability of consumers to purchase airline tickets, there can be no adverse effect on any market.[4] *See Tops Markets, Inc.,* 142 F.3d at 96 ("[T]he fact that Tops may have been prevented from competing in the Jamestown market does not alone prove an adverse effect on competition as a whole. For even if plaintiff were hindered from competing, nothing changed in the relevant product market from the consumer's perspective." (citation omitted)); *Illinois Corporate Travel, Inc. v. Am. Airlines, Inc.,* 889 F.2d 751, 753 (7th Cir.1989) ("Reduced competition among travel agents to sell American's tickets has no effects different from those of vertical restraints that courts routinely sustain."); *Bowen v. New York News, Inc.,* 522 F.2d 1242, 1254 (2d Cir.1975) ("If the restraint stops at that point if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act."). Accordingly, Planetarium's Section 1 claims are dismissed.[5]

## CONCLUSION

For the foregoing reasons, Altour's motion is GRANTED. The Clerk of Court is directed terminate the motions at ECF Nos. 43 and 66 and to close the case.

SO ORDERED.

---

4. Planetarium repeatedly uses the term "price fixing" throughout its amended complaint but provides no allegations regarding specific prices being fixed aside from the fixed commissions agreed to by Altour and members of the Amex Network. Pl. Mem. 25–26. However, Amex and Altour are free to establish their own fixed commission rates within Amex's network. This does not constitute price fixing because no prices are being set. *Cf. Gen. Cinema Corp. v. Buena Vista Distribution Co.,* 681 F.2d 594, 597 (9th Cir.1982) (rejecting motion picture exhibitor's challenge to fixed percentage charged by motion picture distributor when exhibitor did not show how fixed percentage had an effect on exhibitor's ticket price). To the extent that Altour sets commission rates that are too high to allow Amex representative offices to provide sufficiently discounted tickets, customers will purchase discounted tickets through other agencies, and Amex's and Atour's businesses will suffer. This would not constitute an illegal antitrust conspiracy, but rather a bad business model.

5. Because the Court finds that Planetarium has failed to allege a plausible relevant market or anticompetitive conduct, the Court need not reach Altour's remaining arguments.