**BEPCO, INC.; and Heavy Duty Recycling Corporation, Plaintiffs,**

v.

**ALLIED–SIGNAL, INC.; and Allied Signal Truck Brake Systems Co., Defendants.**

**No. Civ. 6:96CV00274.**

United States District Court, M.D. North Carolina.

Feb. 24, 2000.

Norman B. Smith, Smith James Rowlett & Cohen, Greensboro, NC, J. David James, Smith James Rowlett Cohen, Greensboro, NC, for BEPCO, Inc., Heavy Duty Recycling Corporation, plaintiffs.

W. Andrew Copenhaver, David Alan Shirlen, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, Douglas L. Wald, Arnold & Porter, Washington, DC, for Allied–Signal Inc., Allied Signal Truck Brake Systems Co., defendants.

*MEMORANDUM OPINION*

BULLOCK, District Judge.

This matter is before the court on a motion for summary judgment filed by Defendants Allied–Signal, Inc., and Allied Signal Truck Brake Systems Co. (collectively "Allied Signal"). This action arises out of a complaint filed in the General Court of Justice, Superior Court Division, Forsyth County, North Carolina, by Plaintiffs Bepco, Inc., and Heavy Duty Recycling Corporation (collectively "Bepco") in which they asserted various claims against Defendants under North Carolina law. Defendants subsequently removed the suit to this court on the basis of diversity jurisdiction, at which time Plaintiffs amended their complaint to add federal antitrust claims.

Following the completion of discovery, Defendants moved for summary judgment, contending that no genuine issues of material fact exist as to any of Plaintiffs' claims, whether state or federal. For the reasons set forth below, the court will grant Defendants' motion with respect to Plaintiffs' federal claims. The court will deny Defendants' motion with respect to Plaintiffs' state law claims.

## FACTS

The following facts are drawn from the pleadings, affidavits, depositions, and answers to interrogatories offered by the parties. Where disputes exist, each party's position is given.

### A. *Parties, Products, and Markets*

Allied Signal manufactures truck airbrake systems and new valves and new compressors for use in truck airbrake systems. Allied Signal markets these products under the name "Bendix," and they are sold to manufacturers of new trucks, known as "original equipment manufacturers" or "OEMs." Volvo, Freightliner, and Mack are all OEMs.

The markets for these new airbrake systems and for the new compressors and

valves are known as original equipment markets. Allied Signal faces little competition in the highly concentrated compressor and valve original equipment markets. The competing compressor manufacturers include Midland and Cummins, and Midland, Sealco, GT Development, and a few other companies compete for new valve sales. Bepco does not compete in the original equipment markets for compressors or valves. Allied Signal enjoys a dominant position in both the compressor and valve original equipment markets, with market shares which it concedes to have been seventy-six per cent (76%) and eighty-five per cent (85%) in 1995 for compressors and valves, respectively. These percentages reflect increases in Allied Signal's market share in each market over those observed in 1990.

When compressors and valves in a new airbrake system wear out or break down, they usually are replaced rather than repaired. The product installed as a replacement is either a new compressor or valve (known as "service new") or one that is used. The used compressors and valves are cheaper and represent over ninety-five per cent (95%) of all replacement products sold and are created by re-manufacturing the components of old compressors and valves. Because airbrake systems and new compressors and valves are not manufactured in a standard format, an expensive conversion process is required to replace a failed Bendix part with a non-Bendix replacement part. Thus, Bendix-manufactured compressors and valves are almost always replaced with new or re-manufactured Bendix products.

The markets in which these replacement products are sold are known as the aftermarkets for compressors and for valves. Allied Signal re-manufactures used compressors and valves, both Bendix and non-Bendix, for sale in their respective aftermarkets. Allied Signal markets its re-manufactured Bendix compressors and valves as "genuine" replacements. By so doing, it suggests to consumers that it can re-manufacture Bendix parts better than its competitors can, because it manufactured them in the first place. Allied Signal also sells service new Bendix compressors and valves in the aftermarkets. Bepco competes with Allied Signal in both the compressor and valve aftermarkets, re-manufacturing a host of used parts, including Bendix compressors and valves.[1] Because Bepco does not manufacture any new compressors or valves for the original equipment markets, it is unable to market any of its re-manufactured replacement products as "genuine," as Allied Signal can.

Allied Signal expanded its aftermarket presence in 1994 in response the expansion of a competitor. Prior to 1994, Allied Signal, Midland, and other manufacturers of new products in the original equipment markets re-manufactured only their own compressors and valves. Thus all of their replacement products were either service new or genuine re-manufactured products. Midland was the first company to sell re-manufactured compressors and valves which were originally manufactured by competitors like Allied Signal or Cummins. Midland introduced a line of re-manufactured Bendix products under the "Like Nu" label. In response to Midland's move, Allied Signal also began re-manufacturing non-Bendix compressors and valves for sale in the aftermarkets.

The compressor and valve aftermarkets are not highly concentrated markets. Although competitors of Allied Signal from the original equipment markets such as Midland compete in the aftermarkets, numerous independent firms like Bepco which do not manufacture new products also compete. In total, some forty (40) firms compete in the aftermarkets, primarily because little capital is needed to estab-

---

1. Plaintiff Heavy Duty Recycling Corporation ("HDRC") is Bepco's sister company and buys and sells compressor and valve cores in the open market. HDRC provides worn out cores to Bepco.

lish a business which can re-manufacture and sell replacement products. During the 1990's, the aftermarkets became more competitive, not only from the product expansion undertaken by Midland and Allied Signal, but also from the entry of new competitors. In 1996 Euclid, which previously had sold certain truck parts but not compressors and valves, acquired a heavy-duty brake re-manufacturing operation. Bepco sales personnel conceded that Bepco expects to face increased competition from Euclid in the future. Collett Dep. at 322–23; Atherholt Dep. at 244–46; Davis Dep. at 193–94.

Allied Signal does not enjoy the same position of dominance in the aftermarkets for compressors and valves that it enjoys in the corresponding original equipment markets. According to figures generated for purposes of this litigation by Allied Signal, it commanded twenty-eight per cent (28%) of the compressor aftermarket and less than twenty per cent (20%) of the valve aftermarket during the relevant time period. Bepco gained access via discovery to Allied Signal internal marketing documents which suggest that Allied Signal's market shares in the aftermarkets are in fact larger. According to one document, in 1995 Allied Signal had a market share of forty-three per cent (43%) in the compressor aftermarket and thirty-seven per cent (37%) in the valve aftermarket.[2]

Bepco holds a relatively small portion of the aftermarkets, with roughly 2.5 per cent (2.5%) market shares in both the compressor and valve aftermarkets. Bepco contends that its sales dropped during the relevant time period; some of its employees and officials testified in deposition, however, that Bepco's decline is more directly attributable to increased competition in the aftermarkets than it is to allegedly anti-competitive practices on the part of Allied Signal. Atherholt Dep. at 244–46; Collett Dep. at 312–13, 323; McFadden Dep. at 29–30.

### B. Distribution Channels for Replacement Compressors and Replacement Valves

There are two channels through which replacement compressors and valves are distributed to ultimate purchasers. The first channel is made up of independent distributors and is known as the "IAM" channel. These independent distributors number 2,700 in the United States and Canada, a region which the parties agree is the relevant geographic market for this dispute. This figure does not include the substantial number of automotive stores, such as NAPA, which sell re-manufactured truck brake parts.[3] In response to the competition Bepco faced from NAPA outlets, it explored the possibility of securing a similar distribution outlet in CarQuest,

**2.** Bepco also points to a document found among many produced during discovery placing Allied Signal's 1995 valve aftermarket share at 60%. However, according to Defendants' director of aftermarket marketing, Donna Freiberger, and the person who prepared the document, Robert Johnson, the 60% figure was simply a "guess" based on conversations of less than ten minutes with two or three marketing and sales people and was not used for any business planning or decision and was done without having the benefit of the total replacement/valve sales for the market as a whole for 1995. The court does not consider this figure reliable for any market share screening purposes. Bepco must do more than raise "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986). *See Thompson Everett, Inc. v. National Cable Adver.,* 57 F.3d 1317, 1323 (4th Cir.1995).

Plaintiffs have moved to strike the Freiberger and Johnson affidavits which were submitted by Defendants in reply to Plaintiffs' market share arguments in Plaintiffs' response to Defendants' motion for summary judgment. The court finds that such supplementation was proper under the circumstances and will deny Plaintiffs' motion.

**3.** In his deposition, former Allied Signal employee Gary Burow estimated that 750 to 1,000 NAPA stores sold Bendix brake products. During the time period in question NAPA was affiliated with Midland. Burow Dep. at 312–13.

which Bepco considered to be a viable source of Bepco products.

Allied Signal has written agreements with 300 independent distributors which obligate these distributors to sell only genuine Bendix replacement products—Bendix replacement products which are manufactured service new by Allied Signal or re-manufactured by Allied Signal. Allied Signal distributors may, however, carry non-Bendix replacement products which are manufactured service new by Allied Signal competitors or which are re-manufactured by Allied Signal competitors. The distributorship agreements contain a provision which requires the Allied Signal distributor to carry a full line of Bendix products, but, according to Allied Signal, this provision is not enforced. The agreements may be terminated at will by either party, so long as thirty (30) days notice is given. Another 200 distributors get Allied Signal products through its associate distributor program.[4] Freiberger Aff. at ¶¶ 20, 22.

The second, and equally large, channel through which re-manufactured compressors and valves are distributed is known as the "OE dealer" channel. The OE dealers are also distributors who sell replacement products to ultimate consumers, but they are associated with OEMs, such as Volvo and Mack. These distributors number between 2,700 and 2,800, and they may obtain parts directly from OEM suppliers such as Allied Signal and Midland, from independent re-manufacturers such as Bepco, or from independent distributors. The OE dealers also may receive products from their affiliated OEMs, which route the products through parts distribution centers ("PDCs"). Just as any supplier may sell products directly to the OE dealers, anyone may sell products to an OEM, but the OEMs have expressed a preference for stocking their PDCs with genuine re-manufactured products.[5]

Allied Signal sells its replacement products to the OEMs, who then sell them to their affiliated OE dealers via the PDCs. Allied Signal no longer sells replacement products directly to OE dealers. Because the OE dealers are affiliated with OEMs, the dealers have no written distributorship agreements with non-OEM parts suppliers. Companies such as Allied Signal and Midland are unable to exercise control over the source of the OE dealers' products and also are unable to exert any control over the sources from which OEMs supply their PDCs.

As part of its marketing strategy, Bepco elected not to distribute its re-manufactured parts through the OE dealer channel and not to supply the automotive chain stores. It aligned itself instead with the independent distributors, who competed with these other businesses. Former Bepco president James Hudnell described Bepco's decision as to what channel of distribution to throw its weight behind as follows.

> But by practice, [Bepco] had always been most successful going after the independent distributor channel and fighting what I say here, the [OE dealers], the NAPA, and the HDA's [a buying organization to which some independent re-manufacturers sold their products]. And we had promoted the fact [that] we don't participate in them. So it would

---

4. Bepco places this figure at 1,000, counting documents supplied by Defendants to Plaintiffs in response to request for copies of *all* distributor agreements going back to the 1970's, whether currently in force or not.

5. This does not mean, however, that OE dealers carry genuine parts without exception. David Albert, the current manager of Volvo's aftermarket programs, testified in his deposition that his company acquired Bendix-style compressors and valves from Allied Signal and Midland-style compressors and valves from Midland. He also stated, however, that he purchased Cummins compressors re-manufactured by Allied Signal and Sealco valves re-manufactured by Midland or by Allied Signal. Albert was formerly an official at Bepco, and he testified that while he was there some Volvo OE dealers purchased parts from Bepco. Albert Dep. at 10–11.

have been difficult strategically to turn around and say we are now going to do that. Forget everything else we've done in the past.

James Ronald Hudnell Dep., Vol. II at 261. Bepco has not alleged that it was unable to distribute its products in any region of the country where it sought to do so.[6]

In 1995, Allied Signal distributed approximately one-half (½) of its Bendix replacement products through the IAM channel and one-half (½) through the OE dealer channel. Allied Signal has exclusive arrangements with some IAMs, and those arrangements concern only Bendix replacement products. Thus, to the extent Bepco is foreclosed from sources of distribution, it is foreclosed from selling Bendix compressors and valves it re-manufactures to approximately 500 independent distributors (approximately 1,000 according to Plaintiff. *See infra* n. 4). If Allied Signal commanded forty-three per cent (43%) of the compressor aftermarket and thirty-seven per cent (37%) of the valve aftermarket during the period in question, Allied Signal's exclusive agreements with independent distributors would have foreclosed Bepco from roughly 21.5%

and 18.5% of the compressor and valve aftermarkets, respectively.[7]

Initially, OE dealers received replacement products exclusively through direct shipments, which means they received remanufactured compressors and valves directly from the re-manufacturers or directly from independent distributors. In the early 1990's, OEMs set up a program under which the OE dealers could receive remanufactured products from the PDCs. This new channel of distribution resulted in certain efficiencies for the OE dealers with respect to freight charges and caused the prices charged by re-manufacturers on products distributed through the OE dealer channel to drop. Because many OE dealers once were large customers of independent distributors, independent re-manufacturers like Bepco which sell to independent distributors but not to OEMs have suffered in sales due to the shift. According to Allied Signal, the efficiencies generated by the PDC network also resulted in lower prices for ultimate consumers, who likewise shifted their purchases away from independent distributors in favor of OE dealers. As stated above, in 1996 Allied Signal sold fifty per cent (50%) of its

---

**6.** Hudnell testified in his deposition that he could not recall any geographic market where Bepco experienced difficulty finding adequate means of distribution during the mid–1980s. He later stated that in the early 1990s "there were distributor candidates out there." He did not agree that during the relevant time period Bepco was unable to distribute remanufactured Bendix products because of the presence of Allied Signal distributors. Hudnell Dep. at 73–74, 92, 388–89.

**7.** As noted *infra,* one-half of Allied Signal's distribution is through the IAM channel. However, the 21.5% and 18.5% figures are too high given that Bendix replacement products comprise less than 100% of Allied Signal's total replacement product sales. The parties have not, however, provided the court with more accurate figures. As has been noted, Bendix products dominated the compressor and valve original equipment markets, to the tune of seventy-six per cent (76%) and eighty-five per cent (85%) market shares, respectively. Since a worn out part and its replacement are almost always the same

brand, one would expect Bendix products remanufactured by either Allied Signal or a competitor to command roughly corresponding percentages of the compressor and valve aftermarkets (of which Allied Signal enjoys forty-three per cent (43%) and thirty-seven per cent (37%) shares). If seventy-six per cent (76%) and eighty-five (85%) of the replacement compressors and valves sold by Allied Signal were Bendix-style, respectively, then the forty-three per cent (43%) and thirty-seven per cent (37%) figures should be reduced before being halved. This would yield a foreclosure percentage of sixteen per cent (16%) for each replacement product. The greater the percentage of replacement compressors and valves sold by Allied Signal which are non-Bendix, the lower the percentages of the total aftermarkets from which Bepco was foreclosed by Allied Signal's distributorship agreements. Since the actual figures are not given, the court will construe them in the light most favorable to Bepco and use the maximum foreclosure percentages, 21.5% for compressors and 18.5% for valves.

Bendix replacement products through OE dealers. Only six years earlier, however, this figure stood at thirty-three per cent (33%).

## C. Core Charges

All re-manufacturers need the components of used compressors and valves to produce rebuilt products which are sold as replacements. These components are known as "cores" and are acquired either through the core return process or through open market purchases. Re-manufacturers employ the latter method when the former does not yield an adequate number of cores.

When a customer purchases a new or service new compressor or valve, he or she pays the purchase price in exchange for the part. When a re-manufactured compressor or valve is bought, however, the price is divided into two components, an exchange price and a core charge. If the customer returns a used core when buying a replacement part, the customer pays only the exchange price. If the customer does not return a used core, then he or she pays the exchange price plus the core charge. Re-manufacturers set the core charge at a level above that which the cores command on the open market, in order to drive the cores back to their hands rather than onto the open market. Thus, if a distributor seeks to purchase 100 re-manufactured compressors from Midland, but possesses only eighty cores, the distributor has an incentive to buy twenty cores on the open market and return them with the other eighty, rather than pay core charges on twenty replacement compressors.

Not only have all re-manufacturers of compressors and valves instituted core re-turn policies, but most replacement part markets across the automotive industry also exhibit the same characteristic. The re-manufacturers of compressors and valves, including Bepco, all impose comparable core charges.[8] According to Allied Signal, that the core return process is an efficient means of collecting cores is borne out not only by the fact that all re-manufacturers employ the process, but also by the fact that in approximately ninety-five per cent (95%) of all transactions a distributor returns a used core when purchasing a re-manufactured part.

When a new generation compressor or valve appears on the market, there obviously are no cores available for that particular part. Thus, once these compressors or valves begin to wear out, there are no inputs for the re-manufacturing process. This means that the first wave of replacement products sold for a new generation part will be service new parts or new parts sold as re-manufactured parts. In the latter situation a company will sell a new compressor or valve at the re-manufactured price and will impose a core charge if a used part is not returned. As a result, most of the first cores returned make their way back to the original manufacturer. For independent re-manufacturers like Bepco to gain a toehold in the sale of replacement products for newer generation compressors and valves, they must either invest in a large order of new parts from the original manufacturer or wait for a sufficient number of cores to reach the open market.

## D. The Parties' Failed Union

In 1993 Allied Signal expressed an interest in acquiring Bepco as a means of improving its capacity for re-manufacturing

---

**8.** In 1991, Allied Signal revised its core return policy to require "like for like" returns, which means that a customer must now return the same generation core as the re-manufactured part he or she purchases, in order to avoid paying the core charge. This change puts Allied Signal's core return policy in line with those of other re-manufacturers and avoids creating a potential for arbitrage by Allied Signal customers. Before the "like for like" requirement existed, a person could return an old, worthless core when buying a new generation part, which the person would immediately turn around and sell on the open market.

Midland-style parts. Although in the summer of 1993 the parties reached a tentative agreement, by November of that year the talks broke down and the parties never combined. As part of their negotiations, the parties signed a confidentiality agreement regarding terms of the proposed transaction.

### E. *Bepco's Claims*

Bepco brought suit in state court, and Allied Signal removed the matter to this court. In its amended complaint, Bepco asserts a number of federal antitrust claims in addition to its state claims. Bepco contends that the exclusivity requirements of Allied Signal's distributorship agreements, as well as the full-line requirements, constitute unlawful non-price vertical restraints under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Bepco also maintains that Allied Signal's distributorship agreements, core return policy, and other allegedly unlawful conduct allow Bepco to assert monopolization and attempted monopolization claims under Section 2 of the Sherman Act. Bepco also makes a "monopoly leveraging" claim in which it contends that Allied Signal has parlayed a monopoly in the original equipment markets for compressors and valves into a competitive advantage in the compressor and valve aftermarkets. Bepco also seeks relief under a number of state law theories, asserting that Allied Signal has violated North Carolina's unfair trade practices act, has improperly disclosed trade secrets, has disparaged Bepco's products, has breached the parties' confidentiality agreement, and has interfered with Bepco's prospective contractual relationships.

## DISCUSSION

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In considering the evidence, a court must draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

The summary judgment standard does not differ when applied to antitrust claims. *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1322 (4th Cir. 1995). According to the Fourth Circuit, "because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." *Id.* Because the undisputed facts show that Defendant does not have market power or significant economic power in *any* relevant market, Plaintiff's federal claims, however couched, will fail.

### A. *Bepco's Federal Claims*

#### 1. *Relevant market*

Before turning to the claims asserted by Bepco, it first is necessary to define the market in which Allied Signal has allegedly acquired, attempted to acquire, or maintained market power through unlawful means. The parties agree that the relevant geographic market is North America. The parties dispute, however, the proper boundaries of the relevant product market. In fact, although Plaintiffs say it is essential that the relevant product market be defined, they fail to do so. Bepco's own experts offer two alternative product markets. The broader proposed markets would encompass all compressors sold in

the compressor aftermarket and all valves sold in the valve aftermarket. The narrower proposed markets would encompass only Bendix compressors sold in the compressor aftermarket and only Bendix valves sold in the valve aftermarket.

 In an antitrust case, the burden of defining the product market lies with the plaintiff. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997), *cert. denied,* 523 U.S. 1059, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998). Product market definition turns on evidence of interchangeability of product use and manufacture, that is, on evidence of cross-elasticities of supply and demand. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986); *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., Inc.,* 714 F.2d 1384, 1393 (5th Cir.1983). Under this analysis, products A and B occupy the same market if, when the producer of product A raises its price to a supracompetitive level, either (1) consumers of product A substitute product B for product A or (2) producers of product B launch new production of product A or expand existing production of product A. *See* Phillip E. Areeda, Herbert Hovenkamp, & John L. Solow, IIA *Antitrust Law* ¶ 561 (1995). Although the question of market definition is factual rather than legal, in appropriate circumstances the issue may be resolved at summary judgment. *See Colsa Corp. v. Martin Marietta Servs., Inc.,* 133 F.3d 853, 855 n. 4 (11th Cir.1998); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir.1995).

In the present case, Plaintiffs' experts, Fredrick Warren–Boulton and Barry Roberts, not only defined different markets but Roberts rejected Warren–Boulton's narrower market definition when questioned about it at his deposition. Roberts Dep. at 40. In arguing for the narrower definition, Warren–Boulton emphasizes that it would be expensive for a consumer with a worn-out Bendix compressor to replace it with a re-manufactured or service new non-Bendix compressor. According to Warren–Boulton, this deterrent to interchanging non-Bendix and Bendix-style compressors and valves by consumers indicates that there is a low cross-elasticity of demand between Bendix and non-Bendix replacement parts. This would mean that only severe price differentials between Bendix and non-Bendix replacement parts will induce consumers to substitute purchases of one for the other. From this, Warren–Boulton concludes that a producer of Bendix replacement parts is restrained with respect to the prices it charges only by the prices charged by other re-manufacturers of Bendix parts. Warren–Boulton Report at 3.

Warren–Boulton fails, however, to account for cross-elasticity of supply, a failing against which courts have warned. *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406, 1410–11 (7th Cir.1995) (Posner, J.) ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side. Even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price."); *Rebel Oil,* 51 F.3d at 1436 (rejecting plaintiff's narrow market definition where plaintiff's expert failed to account for cross-elasticity of supply); *Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 11 F.3d 660, 665 (6th Cir.1993) (" 'The relevant product market cannot be determined without considering the cross-elasticity of supply.' ") (quoting *Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 957 F.2d 1318, 1327 (6th Cir.), *vacated on other grounds,* 506 U.S. 910, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992)); *Calnetics Corp. v. Volkswagen of Am., Inc.,* 532 F.2d 674, 691 (9th Cir.1976) (rejecting

plaintiff's narrow market definition where district court "refused to consider the cross-elasticity of production facilities or capacity"). The court in *Rebel Oil* stated that "defining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based on 'supply elasticity.'" *Rebel Oil*, 51 F.3d at 1436 (citations omitted).

The record in the case at bar reveals entry into the aftermarkets for compressors and valves by new re-manufacturers, as well as expansion of production by existing competitors. In 1994 Midland began remanufacturing Bendix compressors and valves, as well as other non-Midland products. In response to Midland's move, Allied Signal expanded its remanufacturing capacity beyond Bendix parts. These facts are not in dispute. Warren–Boulton states in his report that "[i]f different style compressors were good substitutes for one another ... I would expect the replacement prices for one style compressor to closely follow the replacement prices of other styles." But again his focus lies solely upon demand substitution and does not account for supply substitution. If re-manufacturers of Bendix and non-Bendix parts can easily adjust and reallocate productive capacity between the two products, producers of each style will be restrained from charging supracompetitive prices.[9]

Bepco relies exclusively on demand-side evidence to support its narrower market definition. The record contains unchallenged evidence that producers have expanded their productive capacities across different styles of replacement compressors and valves. In the face of this evidence, Bepco has failed to point to any supply-side evidence or other factors which bolster its contention that only Bendix-style products occupy the relevant markets.

Further, the fact that Bepco has offered two experts who endorse two different market definitions seriously compromises Bepco's claim to have defined any relevant markets at all. As was stated above, the burden of defining a relevant market in an antitrust claim lies with the plaintiff. *See Queen City Pizza*, 124 F.3d at 436. The Third Circuit emphasized that when a plaintiff fails to define its proposed market with reference to factors germane to the inquiry or proposes a market which "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor," dismissal under Rule 12(b)(6), Federal Rules of Civil Procedure, is warranted. *Id.* (dismissing Sherman Act claims where plaintiff failed to plead valid relevant market).

The court is not aware of a case where a plaintiff was allowed to proceed on Section 2 claims notwithstanding the fact that it offered conflicting experts on the issue of market definition. On the other hand, the court is also not aware of a case where summary judgment was granted on this basis alone.[10] Although the court believes that a proper market definition would be the aftermarket markets for all replacement compressors and all replacement valves, Plaintiffs' claims will fail regardless because of the absence of significant market power in either of the two proposed markets.

**9.** In its brief, Bepco concedes that an even narrower market definition, one that cordons off particular models of Bendix replacement parts into their own markets, would be inappropriate because "defendants are able to substitute component models one for the other ... on the supply side." Unfortunately for Bepco, failure to effectively counter this very same principle with respect to Warren–Boulton's market definitions defeats these definitions.

**10.** Although Bepco cites the OEM markets for new compressors and for new valves as relevant markets with respect to its monopolization and attempted monopolization claims, these markets are not relevant markets. Bepco concedes that it does not compete in the OEM markets. Thus it cannot have suffered any antitrust injury from conduct rising to the level of monopolization or attempted monopolization by Allied Signal in those markets.

### 2. *Market shares*

The importance of defining a relevant market in a Section 2 claim stems from the necessity of analyzing the defendant's market share to resolve such claim. As stated above, the court believes the relevant markets to be the total aftermarkets for replacement compressors and valves, for which Allied Signal determined its market shares to be 28% and 20%, respectively. Bepco's expert Roberts stated in his report that Allied Signal's market share stood "between 25% and 43% for compressors" and "between 19% and 43% for valves." Roberts Report at 7, Dep. at 33. Bepco's expert Warren–Boulton did not offer any market share figures for the total aftermarkets for replacement compressors and valves. In its brief in opposition to Allied Signal's motion for summary judgment, Bepco relied on a document produced by Allied Signal which was generated in its marketing department. This document suggests that Allied Signal's 1994 market shares in the aftermarkets for all compressors and valves were 43% and 37%, respectively. Viewing this evidence in the light most favorable to Bepco, the court will use the 43% and 37% figures in its consideration of Bepco's Section 2 claims.

Even though Bepco advocated relevant markets made up of only Bendix-style replacement compressors and valves, it did not offer any actual market share figures for these markets. Roberts obviously had none to offer, since he did not believe these to be relevant markets. Warren–Boulton, even though he believed the narrower market definitions to be appropriate, computed no numbers on his own. He simply adopted a figure calculated by Allied Signal, which placed its share of the Bendix compressor segment of the compressor aftermarket at 36%. Allied Signal also calculated its share of the Bendix valve segment of the valve aftermarket to be 22%. In the place of actual figures, Bepco in its brief stated that "[v]iewing the more specific markets of Bendix-style replacement compressors and valves, it is reasonable to estimate that the market shares are 76% and 85%, respectively, consistent with defendants' original equipment market shares, at least on a going forward basis." Such speculation would be inappropriate even though at this stage in litigation the court must construe the facts in the light most favorable to Bepco.[11] The court has before it no reliable evidence of market share figures which exceed those it must assume characterize the total aftermarkets for compressors and valves.

### 3. *Section 1 of the Sherman Act/Section 3 of the Clayton Act*

Bepco challenges Allied Signal's distributorship agreements under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Bepco maintains that provisions included in these agreements requiring the distributors to carry a full line of Allied Signal's products and to carry only genuine Bendix products represent unlawful restraints of trade, both independently and in tandem. Even disregarding Plaintiffs' failure to define the relevant market and to show Defendants' market power in that market, market analysis also shows that Defendants' practices do not substantially lessen competition.

### a. *Rule of reason governs distributorship agreements*

Bepco first contends that the distributorship agreements are doomed to *per se* illegality because they constitute unlawful tying arrangements. Bepco's theory here

---

**11.** Bepco's suggestion in oral argument that the court should apply a multiplier to the 43% and 37% figures is little better. Bepco derives the multiplier from the ratio of Allied Signal's figures for its share of Bendix product sales to its figure for its share of total aftermarket sales. It is difficult to understand why Plaintiff believes Allied Signal's figures themselves are unpersuasive, while at the same time the mathematical relationship they bear to each other is.

is that Allied Signal has conditioned the sale of service new Bendix products and re-manufactured new generation Bendix products on the distributor's purchase of the remainder of Allied Signal's line of Bendix products.

■ A tying arrangement is a manner of sale under which the purchaser, in order to buy what he or she truly desires (the tying product) from the seller, must also buy what is known as a "tied product." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). These arrangements may run afoul of the antitrust laws if, when implemented, they force the purchase of a product separate and distinct from the product actually sought. *See id.* at 462, 112 S.Ct. 2072. When the seller enjoys a dominant position or has significant economic power in the market for the tying product, there is a risk of coercion, and the tying arrangement may well enable the seller to increase its market share in the market for the tied product. For this reason, the Supreme Court has declared certain tying arrangements to be illegal *per se,* which means that they are presumed to be unreasonable. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

■ The provision of which Bepco complains, however, is not properly viewed as a traditional tying arrangement. Bepco challenges a provision in Allied Signal's

distributorship agreements which requires Allied Signal distributors to carry a full line of Bendix products.[12] Courts which have been faced with a contract term such as this describe it as a "full line forcing" provision and uniformly refuse to treat it as a *per se* illegal tie, applying instead the rule of reason. *See Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.,* 138 F.3d 869, 875–76 (11th Cir.1998); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1383–85 (5th Cir.1994); *Smith Mach. Co., Inc. v. Hesston Corp.,* 878 F.2d 1290, 1295–97 (10th Cir.1989); *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.,* 917 F.Supp. 1208, 1226–31 (W.D.Tenn.1995); *Ransomes Am. Corp. v. Spartan Distribs., Inc.,* 914 F.Supp. 183, 184–85 (W.D.Mich.1996).[13] The fact that the distributorship agreements contain a separate provision which requires Allied Signal distributors to carry Bendix products which are manufactured or re-manufactured only by Allied Signal does not affect the applicable standard. In several cases cited above, the courts applied the rule of reason where an exclusivity provision accompanied the full line forcing term. *See Southern Card,* 138 F.3d at 876 (where attempt to force plaintiff to carry cards produced only by defendant failed); *Roy B. Taylor,* 28 F.3d at 1384; *Volpp Tractor,* 917 F.Supp. at 1227–29.

b. *Exclusive dealing provision*

■ Bepco contends that the provision in Allied Signal's distributorship agree-

---

**12.** The provision reads: "SECTION 3. SERVICE DISTRIBUTOR shall: (a) carry and maintain an inventory of PRODUCTS sufficient to offer and provide prompt availability to customers within said Primary Area of Responsibility, which inventory, unless otherwise agreed in Exhibit "A", shall be the full line of BENDIX PRODUCTS equal to ninety (90) days supply of said PRODUCTS;...."

**13.** The courts in these cases reached this conclusion by characterizing full line forcing provisions as vertical non-price restraints, to which the rule of reason applies. *See Smith Mach.,* 878 F.2d at 1295–96; *Volpp Tractor,* 917 F.Supp. at 1228–29. The Supreme Court

has held that vertical restraints are not illegal *per se* unless they include an agreement on price or price levels. *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Several courts also emphasize that full line forcing arrangements, which constrain dealers or distributors, do not limit the choices facing consumers. *See Roy B. Taylor,* 28 F.3d at 1383; *Smith Mach.,* 878 F.2d at 1297; *Volpp Tractor,* 917 F.Supp. at 1229–30; *Ransomes,* 914 F.Supp. at 185. This is the case when such consumers may purchase the products separately and have available alternative channels through which to purchase the products.

ments which mandates that the distributor carry only genuine Bendix products constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Courts have interpreted this broad language to proscribe only those restraints found to be unreasonable, that is, those which fail rule of reason scrutiny. *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 144 (4th Cir.1990). The Supreme Court has articulated the rule of reason as follows: "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Section 3 of the Clayton Act specifically targets exclusive dealing arrangements. It provides that:

> It shall be unlawful for any person engaged in commerce ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. According to the Supreme Court, an exclusive dealing arrangement does not offend Section 3 of the Clayton Act "unless the court believes it

probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Courts and commentators disagree as to whether this test outlaws a broader range of conduct than does the rule of reason drawn from Section 1 of the Sherman Act. *Compare Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir.1984) (Posner, J.) (same test under both statutes) *and Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir.1997) (analyzing Clayton Act claim under rule of reason), *cert. denied*, 525 U.S. 812, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998), *with Barr Labs. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir.1992) (holding Section 3 of Clayton Act imposes "stiffer standards of anticompetitiveness" than does Section 1 of Sherman Act). *See also* Herbert Hovenkamp, XI *Antitrust Law* ¶ 1800c4 (1998) (concluding "most sensible" approach would be identical standards of illegality, but noting that "the cases are divided, with a likely majority stating that the Clayton Act requires a smaller showing of anticompetitive effects."). However, even under the lower standard of liability enforced under the Clayton Act by some courts, Bepco has failed to raise a genuine issue of material fact on its challenge to Allied Signal's exclusive dealing arrangement.

■ As set out above, an exclusive dealing arrangement is unlawful when it "foreclose[s] competition in a substantial share of the line of commerce affected." *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. A plaintiff makes out a *prima facie* case of unlawful exclusive dealing by demonstrating first that a significant percentage of the market in question is foreclosed by the provision challenged.[14] Unless this per-

---

**14.** Courts and commentators have not settled on a magic percentage as constituting significant foreclosure; provisions involving foreclosure as low as twenty-four per cent (24%) have been condemned while others involving foreclosure as high as fifty per cent (50%)

have been tolerated. *Compare Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1298 (9th Cir.1982) (twenty-four per cent (24%) unlawful where contracts were long-term) *with Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227,

centage is so high as to be presumed substantial, the plaintiff must demonstrate its substantiality through an analysis of the nature of the market. *Tampa Elec.*, 365 U.S. at 329, 81 S.Ct. 623 ("To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition...."). This test has been dubbed the "qualitative substantiality" test,[15] and factors relevant to the analysis include the duration of the exclusive agreement, the ability of consumers to comparison shop and their propensity to switch products, the existence of barriers to entry, and the availability of alternative channels of distribution. *See Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1233–34 (8th Cir.1987); *see also* XI *Antitrust Law* ¶ 1821d. The lower the foreclosure percentage, the more salient these factors become in determining whether there has been substantial foreclosure.

As described in the statement of facts above, Bepco presents best-case foreclosure rates of 21.5% in the compressor aftermarket and 18.5% in the valve aftermarket. These percentages fall far short of any value presumed to be substantial and lie on the margin of what is considered to be significant. *See* XI *Antitrust Law* ¶ 1821c (setting twenty per cent (20%) as floor for significant foreclosure and identifying fifty per cent (50%) as level at which courts "routinely condemn" foreclosure). Bepco fails to raise a genuine issue on its exclusive dealing claim because it can point to no factor from which one could infer that the foreclosure in this case is substantial.

Bepco has failed to offer evidence which suggests that the provision it challenges imposed any anticompetitive harm on the aftermarkets for compressors and valves. As an initial matter, Bepco has not demonstrated that it or any other competitors have been excluded in fact from distributing their products in any region of the United States or Canada where they desire to do so. The record includes testimony from Bepco officials that Bepco was always able to distribute its products and was never shut out of a particular region because of Allied Signal's exclusive arrangements. Moreover, the record reveals that Bepco declined to take advantage of entire classes of distribution. These other channels of distribution, namely the OE dealer channel and the automotive chain stores, distribute fifty per cent (50%) or more of the replacement compressors and valves sold and are free from any barrier to Bepco's participation erected by Allied Signal. Finally, the record also makes plain that during the time period in question the aftermarkets for compressors and valves were marked by vigorous competition among some forty (40) firms, expansion of production by rivals to Allied Signal, and entry by new competitors. Absent actual exclusion there can be no injury to competition. *See Roland Machinery*, 749 F.2d at 394 ("[In order to prevail on an exclusive dealing claim the plaintiff] must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition."); *see also Jefferson Parish*, 466 U.S. at 45, 104 S.Ct. 1551 (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are

237–38 (1st Cir.1983) (fifty per cent (50%) lawful where requirements contract had limited anticompetitive effect) *and Sewell Plastics, Inc. v. Coca–Cola Co.*, 720 F.Supp. 1196, 1218–20 (W.D.N.C.1989) (forty per cent (40%) lawful where no anticompetitive harm shown), *aff'd in part,* 912 F.2d 463 (4th Cir. 1990). Professor Hovenkamp suggests twenty per cent (20%) as an appropriate minimum foreclosure percentage. *See* XI *Antitrust Law* ¶ 1821c.

**15.** The court in *Barr Labs.,* for example, uses this term to describe the flexible inquiry set forth by the Supreme Court in *Tampa Electric. Barr Labs.,* 978 F.2d at 111.

frozen out of a market by the exclusive deal.").

The provision in question also poses a less significant threat to competition because it is part of an agreement which is of short-term duration. Either the distributor or Allied Signal may terminate the agreement at will, so long as the terminating party gives thirty (30) days' notice. The Fourth Circuit has held that exclusive contracts terminable after thirty (30) days to one (1) year do not have substantial anticompetitive effects. *Thompson Everett*, 57 F.3d at 1326 (affirming summary judgment for defendants). The Fourth Circuit's approach is consistent with that exhibited by its sister circuits and by commentators alike. *See Omega Envtl.*, 127 F.3d at 1163–64 (approving contracts with duration of up to one year); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir.1993) (stating that thirty-day exclusivity clause normally *de minimis* constraint); *Roland Machinery*, 749 F.2d at 395 ("Exclusive-dealing contracts terminable in less than a year are presumptively lawful under Section 3."); *see also* XI *Antitrust Law* ¶ 1821d3 ("We suggest presumptively that periods of less than one year be approved. . . ."). Bepco contends that switching was impeded because so doing would cause the distributor to lose its source of certain products which only Allied Signal offers. The only distributor who was deposed, however, testified that after being terminated by Allied Signal he remained able to secure the full line of Bendix products.[16] Dennis Dep. at 53–57.

The third and final strike against Bepco's exclusive dealing claim results from the pro-competitive benefits inherent in exclusive distributorships. As other courts have observed, "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Omega Environmental*, 127 F.3d at 1162; *see also Ryko*, 823 F.2d at 1235 ("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of 'substantial foreclosure'. . . ."). Not only do exclusive distributorships not harm the ultimate consumer if sufficient channels are available for all manufacturers to distribute their product (the case here), but they also can promote interbrand competition by eliminating the opportunity for certain forms of free riding (taking advantage of promotional assistance, training, etc.). *See Roland Machinery*, 749 F.2d at 395; *see also* XI *Antitrust Law* ¶ 1812.

### c. Full line forcing provision

■ Bepco's contention that the anticompetitive harm inflicted by the exclusive dealing provision is amplified by the presence of the full line forcing provision is not persuasive. Bepco does not contend that Allied Signal distributors are prohibited from purchasing non-Bendix products from suppliers other than Allied Signal under either provision. Thus the full line forcing provision does not prohibit suppliers like Bepco from selling products not covered by the exclusivity provision to Allied Signal distributors. The full line forcing provision also does not make distributor switching any less likely. The only impact the full line forcing provision has on the aftermarkets for compressors and valves is to set the level of Bendix inventory Allied Signal distributors must carry. This sort of impact is not harmful to competition.

In sum, Bepco has failed to "do more than simply show that there is some meta-

---

16. Bepco's argument here is similar to an argument advanced by the plaintiff in *Omega Environmental*. In response to the contention that defendant's distributors would not abandon defendant's products, the Ninth Circuit stated: "We agree with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace, but reject the notion that this is anticompetitive. It is the essence of competition." *Omega Environmental*, 127 F.3d at 1164.

physical doubt as to the material facts" with respect to its exclusive dealing claim. For this reason, summary judgment in favor of Allied Signal on this claim is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 4. *Section 2 of the Sherman Act*

Bepco also asserts in its amended complaint a series of federal claims against Allied Signal under Section 2 of the Sherman Act. Whereas Section 1 targets agreements between two or more parties in restraint of trade, Section 2 is directed against unilateral conduct by a single party which threatens a particular market with anticompetitive harm. Citing the latter section, Bepco contends that Allied Signal has engaged in monopolization, attempted monopolization, and monopoly leveraging. The court does not agree.

### a. *Monopolization claim*

■ To prevail on a monopolization claim under Section 2 of the Sherman Act, "a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health–Care Servs.*, 910 F.2d at 147. Courts have imposed on antitrust plaintiffs certain threshold showings as to market share in a relevant market before they may proceed on a monopolization claim. This shorthand method is necessary because it is quite often difficult to determine through direct evidence whether monopoly power, the ability to restrict output and thereby raise prices to supracompetitive levels, exists. *See* IIA *Antitrust Law* ¶ 501 and Phillip E. Areeda & Herbert Hovenkamp, IIIA *Antitrust Law* ¶ 801 (1996); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (noting that monopoly power defined as power to control prices or exclude competition); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir.1998) ("[Mo-

nopoly power] may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."); *Rebel Oil*, 51 F.3d at 1434 (indirect evidence of monopoly power "more common" type of proof in Section 2 claim).

■ Bepco's best-case market share figures are well short of the minimums required by courts for a plaintiff asserting a monopolization claim under Section 2. Seventy (70%) to seventy-five (75%) per cent is the generally accepted floor. *White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir.1974) (noting that monopoly power usually found when defendant controls 70% to 100% of relevant market); *see also Tops Markets*, 142 F.3d at 99 (stating that market share of over 70% usually "strong evidence" of monopoly power, although not conclusive); *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 967 (10th Cir.1990) (noting that most lower courts require minimum showing of 70% to 80% market share for plaintiff to establish monopoly power); IIIA *Antitrust Law* ¶ 801 (advocating 70% to 75% threshold).

Bepco has been unable to point to any factor which would cause the otherwise insufficient market share figures in the record to raise a genuine issue as to the existence of monopoly power. The presence or absence of significant barriers to entry is treated by courts as a particularly salient factor since, if new competitors are able to enter the relevant market, plaintiff's claim that the defendant enjoys the power to exclude competition is severely damaged. *See Tops Markets*, 142 F.3d at 99 (affirming summary judgment for defendant on Section 2 monopolization claim despite defendant's 72% market share, where plaintiff failed to rebut defendant's demonstration of relative ease of competitor entry); *Rebel Oil*, 51 F.3d at 1439 ("To justify a finding that a defendant has the power to control prices, entry barriers must be significant—they must be capable

of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting."). In the case at bar, the record reflects vigorous competition among some forty different remanufacturing firms in the relevant markets. Moreover, during the time period in question a new and powerful competitor, Euclid, entered the relevant markets. This evidence confirms Allied Signal's lack of monopoly power and suggests that the market share figures provided by Bepco in fact overstate Allied Signal's control over the relevant markets.

For these reasons, Bepco has failed to raise a genuine issue of material fact as to its monopolization claim. Allied Signal is therefore entitled to summary judgment on this claim.

### b. *Attempted monopolization claim*

■ As its text makes clear, Section 2 of the Sherman Act also prohibits attempts to monopolize a relevant market. To prevail in an attempted monopolization claim, "the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization." *Advanced Health–Care Servs.*, 910 F.2d at 147. Because the court may infer specific intent to monopolize from the presence of anticompetitive practices, it is appropriate to begin an analysis of Bepco's attempted monopolization claim by looking to its second and third elements. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992).

■ A plaintiff demonstrates the third element of an attempted monopolization claim, namely the dangerous probability of success, much in the same manner that a monopolization plaintiff demonstrates the defendant's monopoly power. Evidence of the defendant's market share in the relevant market again carries presumptive weight at certain levels, tempered by the weight of several market-related factors. The Fourth Circuit has settled upon the

following algorithm for disposing of attempted monopolization claims. If the record reveals that the defendant's market share falls short of thirty per cent (30%) in the relevant market, plaintiff's claim should be presumptively rejected. *M & M Med. Supplies*, 981 F.2d at 168. Claims involving a market share in excess of fifty per cent (50%) should proceed, so long as the plaintiff establishes each of the other elements of attempted monopolization. *Id.* When the record discloses that defendant's market share lies between thirty per cent (30%) and fifty per cent (50%), the claim should "usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant per se liable." *Id.*

■ The market share figures Bepco has gleaned from documents provided by Allied Signal include forty-three per cent (43%) and thirty-seven per cent (37%) figures for the total aftermarkets for compressors and valves in 1994, respectively. This falls squarely within the range of market share figures which the Fourth Circuit has held should usually doom the claim. *M & M Med. Supplies*, 981 F.2d at 168. Based on these figures, Bepco has failed to raise a genuine issue with respect to its attempted monopolization claim. It has pointed to no facts which suggest that these numbers, while low, imply that a dangerous probability of Allied Signal's success at achieving monopolization exists. As was discussed above, the record contains abundant evidence that is contraindicative of barriers to entry.

Bepco is unable to point to any conduct properly regarded by this court as anticompetitive. The provisions contained in Allied Signal's distributorship agreements cannot satisfy the second element of Bepco's attempted monopolization claim, as they are tolerated by Section 3 of the Clayton Act. *Tampa Elec.*, 365 U.S. at 335, 81 S.Ct. 623. Neither can the various business tort theories advanced by Bepco

**832**

under North Carolina law supply the requisite anticompetitive conduct for its Section 2 claim. The Fourth Circuit has cautioned courts against converting ordinary business torts into violations of antitrust laws because so doing would create a federal common law of unfair competition. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir.1990).

Thus the only prop remaining with which Bepco may support the second element of its Section 2 attempted monopolization claim is the core return policy enforced by Allied Signal. This theory of anticompetitive conduct fails as well. The record reveals that all re-manufacturers (including Bepco) in the relevant markets employ core return policies as their primary means of acquiring cores, which are the inputs for the remanufacturing process.[17] The record also reveals that the characteristics of each competitor's core return policy are similar. The competitors all impose analogous core charges if the consumer does not return a used core, and all require the returned core to be of the same generation as the replacement core. The court has great difficulty with an outcome which would prohibit a single market participant from engaging in conduct which is the industry standard. A plaintiff may not use the federal antitrust laws to protect it from the rigors of competition. *Abcor*, 916 F.2d at 927–28, 931–32.

Finally, the evidence demonstrates that Allied Signal's core return policy inflicts no anticompetitive harm on the relevant markets. As an initial matter, Bepco has not adduced evidence which demonstrates that it or any other competitor has been unable to acquire Bendix cores of any generation. While it may be more difficult to acquire cores for newer generation compressors and valves, the cores of which have yet to become abundant on the open market, Bepco has not demonstrated that acquisi-

tion of such cores is impossible. In fact, Allied Signal has submitted evidence which demonstrates that its competitors are able to offer re-manufactured new generation Bendix. compressors and valves for sale. O'Connor Dep. at 39. For the same reasons that it is difficult for re-manufacturers other than Allied Signal to acquire newer generation Bendix cores, it is also difficult for re-manufacturers other than Midland to acquire cores for newer generation Midland parts. That Bepco will face difficulties acquiring cores for new generation parts of any make is inherent in the fact that Bepco does not manufacture any new parts itself.

Furthermore, the fact that the core charges imposed by Allied Signal exceed the open market value of the applicable cores is of no moment; if they were less than the open market value, no consumer would return a core. He or she would simply pay the core charge and sell the core on the open market. Bepco complains that Allied Signal's core charges are excessive relative to the savings gained by the remanufacturing process and to the core charges imposed by Allied Signal's competitors. These complaints are also without merit. The core charge is not a cost to Allied Signal of producing a remanufactured part, so it cannot reduce the cost savings realized by Allied Signal by remanufacturing used cores. As to the second complaint, a more expensive core charge imposed by Allied Signal will not deter consumers from purchasing competitors' products, so long as every competitor's core charge exceeds the open market value of the cores. Since every consumer will return a core to avoid any re-manufacturer's core charge, product selection based on price will center upon the exchange price of the products rather than upon their core charges.[18]

---

**17.** Allied Signal also has submitted evidence which suggests that the replacement part industry in general is populated by re-manufacturers who have instituted core return policies.

**18.** Bepco has also alleged that Allied Signal acquired Bendix cores and either warehoused or destroyed them in order to keep them out of the hands of its competitors. This allegation is not supported by facts which, even cast

Because Bepco has failed to demonstrate both the existence of anti-competitive conduct on the part of Allied Signal and a dangerous probability of success, Bepco has failed to raise a genuine issue of material fact as to its attempted monopolization claim. Allied Signal is therefore entitled to summary judgment on this claim.

### c. *Monopoly leveraging claim*

██ Bepco asserts a third and final claim under Section 2 of the Sherman Act, a claim known as "monopoly leveraging." This theory of recovery stems from dicta in the Second Circuit case of *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275–76 (2d Cir.1979). *See AD/SAT, A Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 230 (2d Cir.1999) (characterizing monopoly leveraging portion of *Berkey Photo* as "dictum"). Under monopoly leveraging, a defendant who enjoys monopoly power in one market faces liability under Section 2 if it uses such monopoly power to gain unfair advantage in a second market, causing antitrust injury in the second market. *Advanced Health–Care Servs.*, 910 F.2d at 149. According to Bepco, Allied Signal has attempted to leverage monopoly power in the OEM markets for compressors and valves into an unfair competitive edge in the aftermarkets for those products.

The Fourth Circuit has never expressly recognized the theory of monopoly leveraging. *M & M Med. Supplies*, 981 F.2d at 168–69; *Advanced Health–Care Servs.*, 910 F.2d at 149 n. 17. On remand, the district court in *Advanced Health–Care Servs.* rejected monopoly leveraging as a viable Section 2 theory. *See Advanced Health–Care Servs., Inc. v. Giles Mem. Hosp.*, 846 F.Supp. 488, 496–97 (W.D.Va.1994). In so doing, the district court relied upon other circuits which have also rejected the theory. *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 204–06 (3d Cir. 1992); *Alaska Airlines, Inc. v. United Air-*

*lines, Inc.*, 948 F.2d 536, 546–49 (9th Cir. 1991).

Monopoly leveraging as a Section 2 theory was further weakened by a Supreme Court decision which followed *Berkey Photo*. In this later decision, the Court held that Section 2 "makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In the wake of this decision, lower courts have concluded that its holding dooms monopoly leveraging as a theory independent of attempted monopolization. *See Wojcieszek v. New England Tel. and Tel. Co.*, 977 F.Supp. 527, 535–36 (D.Mass.1997); *Spruce Oil Corp. v. Archer–Daniels–Midland Co.*, 870 F.Supp. 1005, 1007 (D.Colo.1994).

██ In light of the cited authority, the court does not believe that the Fourth Circuit would recognize monopoly leveraging as a theory independent of attempted monopolization. Even if it would, for the reasons already discussed above, Bepco has failed to produce evidence of anticompetitive conduct by Allied Signal in the aftermarkets or of anticompetitive harm in those markets. Thus even if it were a viable theory, Bepco has failed to raise a genuine issue of material fact as to its monopoly leveraging claim. Allied Signal is therefore entitled to summary judgment on this claim.

### B. *Bepco's State Claims*

In addition to the federal antitrust claims alleged in Bepco's amended complaint, Bepco has advanced a number of claims under the law of North Carolina, including unfair trade practices claims under N.C.Gen.Stat. § 75–1.1, breach of contract including violation of the North Carolina Trade Secrets Protection Act, N.C.Gen.Stat. § 66–152 *et seq.*, defamation, and interference with prospective contracts, including the violation of N.C.Gen.

in the light most favorable to Bepco, raise a genuine issue as to its existence.

Stat. § 75–5(b)(2) (since repealed). Allied Signal admits that it breached a confidentiality agreement between the parties by disclosing the parties' failed negotiations. Bepco's Trade Secrets Protection Act claim goes beyond this admitted breach, however, and apparently concerns Allied Signal's alleged use of certain confidential information obtained from Bepco. Likewise, Bepco's unfair trade practices act claims appear to encompass more than the federal antitrust claims which the court has rejected, and include product disparagement and defamation. Bepco's interference with prospective contracts claim is based in part on N.C.Gen.Stat. § 75–5(b)(2), since repealed, which made unlawful under state law contracts for the sale of goods conditioned upon the purchaser's agreement not to handle similar goods of a competitor. The validity of this claim is uncertain in view of the court's rejection of Bepco's federal claims based on Allied Signal's distributorship agreements requiring exclusive dealing and including full line forcing provisions.

Because of Allied Signal's admissions and the factual conflicts concerning Bepco's unfair trade practices, trade secrets, and breach of contract claims, the court will deny Allied Signal's motion for summary judgment on these state law claims to the extent that they are not dependent on Bepco's rejected federal antitrust claims. Bepco's interference claim under N.C.Gen.Stat. § 75–5(b)(2) and the proper application of that statute may be more appropriately considered as a matter of law at the time of trial.

## CONCLUSION

For the reasons set forth above, the court will grant Defendants' motion for summary judgment with respect to Plaintiffs' federal antitrust claims. The court will deny Defendants' motion for summary judgment with respect to Plaintiffs' state law claims.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' motion for summary judgment [Doc. # 60] is **GRANTED IN PART AND DENIED IN PART.** Defendants' motion for summary judgment with respect to Plaintiffs' federal antitrust claims is **GRANTED,** and Plaintiffs' federal antitrust claims are **DISMISSED** with prejudice. Further, Defendants' motion for summary judgment with respect to Plaintiffs' state law claims is **DENIED.**

IT IS FURTHER ORDERED that Plaintiffs' motion to strike [Doc. # 72] is **DENIED.**